Joseph J. JOHNSON et al., Appellants,

v.

Robert L. BUCK and Bunny Jayne Buck, Appellees.

No. 1051.

Court of Civil Appeals of Texas, Corpus Christi.

June 30, 1976.

Rehearing Denied Aug. 30, 1976.

Fred A. Collins, W. James Kronzer, Vinson, Elkins, Searls, Connally & Smith, Tom A. Alexander, Butler, Binion, Rice, Cook & Knapp, Houston, for appellants.

Percy Foreman, Levert J. Able, Tom Coleman, Jr., Houston, for appellees.

## OPINION

BISSETT, Justice.

This is an appeal from a judgment that rescinded and set aside certain instruments of sale executed by Robert L. Buck and Bunny Jayne Buck, and awarded them the sum of $6,377,365.89, with interest thereon at the rate of 6% per annum from January 31, 1970 until paid. The suit arose out of a partnership between Joseph J. Johnson and Robert L. Buck in which each party owned an undivided one-half interest in certain properties in Houston, Texas. Buck agreed to sell his interest therein to Johnson in late 1968, but the sale was not fully completed until January 31, 1970, when the final instruments of sale were executed and the partnership was terminated.

The case was tried to the court without a jury. Following a two-month trial which commenced on January 6, 1975, judgment was rendered on April 30, 1975. Joseph J. Johnson, SSRD, Inc., Memorial City General Hospital, Inc., and SSB, Inc., plaintiffs and cross-defendants in the trial court, have appealed from the judgment. We affirm.

The appellants will be referred to as "Johnson", and the appellees will be referred to as "Buck".

■ Findings of fact and conclusions of law were neither requested nor filed. Therefore, the trial court's judgment implies all necessary fact findings to support it. *Seaman v. Seaman*, 425 S.W.2d 339 (Tex.Sup.1968).

Johnson says in his brief:

". . . The attack here will be that those 'implied' and 'presumed' findings are against the great weight and overwhelming preponderance of the evidence, and alternatively, that the damage finding is 'excessive'."

The trial court impliedly found that in connection with the sale and purchase Johnson made misrepresentations and concealments of material facts which induced Buck to sell his interest in the partnership properties for less than what they were actually worth, and that but for such misrepresentations and concealments Buck would not have sold the same to Johnson at the agreed sale and purchase price. We hold. that there is ample evidence to sustain those implied findings and that they are not against the great weight and overwhelming preponderance of the evidence. We further hold that the judgment award is not excessive.

Johnson filed suit against Buck on July 14, 1972 to recover certain monies, which he alleged was due because of Buck's failure to pay certain sums of money pursuant to their agreement of sale, and to recover an unspecified amount of money caused by the failure of Buck to execute partial releases and subordination agreements in accordance with their agreement. In addition to answering the petition, Buck filed a cross-action against Johnson and SSRD, Inc., Memorial City General Hospital, Inc., and SSB, Inc., Johnson's wholly-owned corporations. It was alleged; that a 50–50 partnership was entered into by and between Johnson and Buck in May, 1959; that the partnership thereafter acquired and developed various real properties; that Johnson, on several occasions, dealt secretly and for his own account in certain projects of his own and thereby violated the fiduciary duty he owed to Buck; that the purchase of Buck's net equity in the partnership was an unfair transaction and for an inadequate consideration; that the sale was made as a result of fraud, misrepresentations and concealments by Johnson which were deliberately made by him as an inducement for Buck to agree to the sale; and that but for such fraud, material misrepresentations and concealments, Buck would not have agreed to sell their net equity in the partnership properties to Johnson for the amount of money paid by Johnson. Buck asked for a dissolution of the partnership as of January 31, 1970, for an accounting for the difference between what they had received and the value of their one-half interest in the partnership as of January 31, 1970; and that the sale of their interest therein to Johnson be rescinded and set aside because of Johnson's fraud, misrepresentations and concealments.

Johnson denied generally the allegations of the cross-action and also set up a plea of limitations to the asserted action. In addition, he pled that in 1969 and 1970, he purchased Buck's interest in the properties owned by Buck "in their joint ventures" and that their "relationship was terminated by the purchase of the interest of Robert L. Buck and Bunny Jayne Buck, as reflected in the instruments".

Johnson, in his first six points of error, contends:

### "POINT OF ERROR NO. 1

The implied finding or findings that Johnson made material misrepresentations of material facts leading to the execution of the buy-sell agreement, or failed to disclose material facts, is or are so against the great weight and overwhelming preponderance of the evidence as to be clearly wrong and unjust.

### POINT OF ERROR NO. 2

There is no competent or probative evidence to support an implied finding that the alleged misrepresentations of Johnson were not merely statements of opinion, which opinions were based upon underlying facts which Buck either knew or to which Buck had equal access, and, therefore, no recovery can be premised upon such statements and this cause must be reversed and remanded.

### POINT OF ERROR NO. 3

The implied finding that the alleged misrepresentations of Johnson were not merely statements of opinion, which opinions were based upon underlying facts which Buck either knew or to which Buck had equal access, is so against the great weight and overwhelming preponderance of the evidence as to be clearly wrong and unjust.

### POINT OF ERROR NO. 4

The implied finding or findings that Buck did not know the true facts respecting the claimed misrepresentations or the alleged undisclosed facts is or are so against the great weight and overwhelming preponderance of the evidence as to be wrong and unjust.

### POINT OF ERROR NO. 5

There is no competent or probative evidence to support an implied finding that Buck could have justifiably relied to his detriment upon any alleged misrepresentation of the type allegedly made by Johnson in agreeing to sell for the agreed upon consideration and, therefore, this cause must be reversed and rendered.

### POINT OF ERROR NO. 6

The implied finding that Buck could have justifiably relied upon any of the alleged misrepresentation of the type allegedly made by Johnson in agreeing to sell for the agreed upon consideration is so against the great weight and overwhelming preponderance of the evidence as to be clearly wrong and unjust."

■ In disposing of the "no evidence" points, the rule of *Renfro Drug Co. v. Lewis,* 149 Tex. 507, 235 S.W.2d 609 (1950), controls since findings of fact were neither requested nor filed; in that respect, we, therefore, will consider only the evidence that is favorable to the judgment and will disregard entirely that evidence which is opposed to it. In ruling on the "against the great weight and preponderance of the evidence" points, we will consider and weigh all of the evidence. *In re King's Estate,* 150 Tex. 662, 244 S.W.2d 660 (1951); 38 Tex.L.Rev. 361 (1960).

### IN GENERAL

The evidence conclusively shows that Johnson and Buck entered into a business arrangement in May, 1959, for the purpose of acquiring and developing real property in Houston. At that time, Johnson was in the house-building business, and had built between 20 and 25 houses the year before. In 1958, Johnson had a net profit of $8,045.72. Buck, who had been a vice-president of Williams Brothers Pipeline Company, but who was not employed in 1959, sold a large block of stock in Williams Brothers in order to provide the needed capital for the business. He made $100,000.00 available to the business by advancing $50,000.00 directly to the business and by loaning $50,000.00 to Johnson, who advanced that sum to the

business. All of the $100,000.00 had been repaid to Buck by February, 1968. In June, 1963, it was agreed that Johnson and Buck would "draw" $2,500.00 each per month from the business, which was later increased to $5,000.00 each per month.

It is undisputed that Johnson and Buck, each owned a 50% interest in the business, and were to share profits and losses on a 50–50 basis after the capital contributions were repaid. They kept a separate set of books and maintained bank accounts designated as partnership accounts of Joseph J. Johnson and Robert L. Buck. Johnson was designated and acted as managing partner. The record supports an implied finding that a partnership existed between Johnson and Buck from May, 1959 until January 31, 1970, and that Johnson was the managing partner at all times. Johnson does not challenge that implied finding by a point of error.

■ There is competent and probative evidence that Johnson, on several occasions prior to June, 1968, by some of his dealings with partnership properties, obtained and retained monetary benefits that were not shared in by Buck. We do not deem it necessary to discuss those details. However, Johnson, the managing partner, is prohibited and precluded from reaping any benefit, to the exclusion of Buck, from self-dealing in the properties in which Buck had a partnership interest, irrespective of whether the title thereto was held and owned by one of the development corporations owned by Johnson and Buck, or by the partnership entity. *International Bankers Life Insurance Co. v. Holloway*, 368 S.W.2d 567 (Tex.Sup.1963); *Slay v. Burnett Trust*, 143 Tex. 621, 187 S.W.2d 377 (1945); *Kinzbach Tool Co., Inc. v. Corbett-Wallace Corporation*, 138 Tex. 565, 160 S.W.2d 509 (1942). Johnson must account to the partnership for all profits which he made as a result of "self-dealing". *Omohundro v. Matthews*, 161 Tex. 367, 341 S.W.2d 401 (1960); *Smith v. Bolin*, 153 Tex. 486, 271 S.W.2d 93 (1954); *Fitz-Gerald v. Hull*, 150 Tex. 39, 237 S.W.2d 256 (1951). Such accounting, however, does not include the

"Spring Shadows" development, since that land was acquired and the development accomplished solely by Johnson, in his own name, with his own money, and on his own credit. "Spring Shadows" was never an asset of the partnership.

■ It is a rule of long standing that each partner in a partnership business is a confidential agent of the other partner, and each is required to make full disclosure of all material facts known to him with respect to partnership affairs. Partners do not deal with each other at arm's length, and in a sale by one partner to another of his interest in the partnership, an absolute duty of full disclosure of all material facts and information to the buying partner is imposed upon the selling partner; such a sale, when challenged, "will be sustained only when it is made in good faith, for a fair consideration and on a full and complete disclosure of all information as to value". *Johnson v. Peckham*, 132 Tex. 148, 120 S.W.2d 786 (1938).

During 1959 and 1960, Johnson and Buck acquired two tracts of land, Memorial Hollow and Memorial Glen, in the Memorial area of west Houston, which they developed as residential subdivisions. In 1962, they purchased a tract in the vicinity of their residential-development tracts, fronting on the Katy Freeway, for commercial real estate development. Later, they acquired additional tracts of land. Ultimately, this acquisition totalled some 165 acres, or about 7,000,000 square feet. In January, 1963, they obligated themselves to develop the tract. The improvements, including all of the buildings either planned or actually built thereon, were intended to form a commercial complex. Henceforth, the development will be referred to as "Memorial City", which includes the regional shopping center named "Memorial City Shopping Center" as an integral part thereof.

Construction of the Memorial City Shopping Center began in 1964. The parties had to borrow on a continuing basis. In August, 1968, a store building in the Memorial City Shopping Center, to be leased to Globe, was finished. A loan of $1,700,000.00 on

the improvements was funded in October, 1968. It was agreed that a substantial portion of that sum of money would be used to pay construction costs, commissions and to repay certain loans. But, a disagreement arose as to what should be done with the remaining balance. Buck then refused to execute certain documents that Johnson wanted him to sign, and Johnson refused to countersign any more monthly "draw" checks in Buck's favor. The business relationship between Johnson and Buck became strained. In October, 1968, Johnson offered to buy Buck's interest for $1,500,000.00, or to sell Buck his interest for the same amount of money. After discussion, Buck agreed to sell his one-half interest in the partnership properties (Memorial City) to Johnson for $1,750,000.00. Johnson accepted. The sale was structured in two parts: 1) Buck's interest in the unimproved properties in Memorial City was conveyed to Johnson on January 31, 1969; 2) his interest in the improved properties were conveyed to Johnson on January 31, 1970. Johnson assumed the payment of Buck's share of the liabilities. At the time of trial, Johnson had paid Buck a total of $1,317,938.25.

By the end of 1968, the Professional Building, Phase I, the Shopping Center, Phase I, the Service Center, Memorial City Apartments, the Globe Store, several gasoline service stations, the Bank Building, and the Jack-in-the-Box Building had been completed in Memorial City. Plans for further developments were being prepared and implemented.

The record is voluminous. The briefs total 770 pages, of which 610 pages are printed. More than 50 witnesses testified. The statement of facts numbers 5,289 pages. The more than 600 exhibits comprise many thousands of pages. A notation in the statement of facts states: "costs have been paid by plaintiff in the amount of $26,700.00". The size of the record and the type of points brought up in this appeal require a lengthy and detailed opinion. We have read the record in its entirety and have carefully considered all of Johnson's points of error, the evidence produced by him at the trial, and the arguments advanced in his brief. It would be impractical to set out all of the evidence adduced at the trial. We do, however, make mention of the particular evidence that each party claims is important to their position in this appeal.

Specifically, Buck claims that Johnson, in 1968, misrepresented and concealed from him the true facts concerning: the financial condition of the partnership; the net equity of the partnership; the Memorial City Apartment Loan; the plans for Memorial City Hospital; and Foley's as an anchor tenant for Memorial City Shopping Center. He further contends that Johnson did not make a good faith offer to sell, and would not have sold his one-half interest in the partnership properties to him for $1,500,000.00.

Johnson denies the claims made by Buck, and further asserts that Buck's claims of misrepresentation and concealment of material facts rest largely upon his own testimony, the testimony of Mrs. Buck (who are interested parties), and the testimony of Mrs. Laura F. Bowers and Mrs. Margaret O'Keiff, Buck's supporting witnesses. He discounts the weight of the testimony of Mr. and Mrs. Buck because of their very personal interest in the litigation. He challenges the weight of the testimony of their supporting witnesses because of their bias and the contradiction of their testimony by Johnson's witnesses.

Mrs. Bowers worked in the office for Buck and Johnson from June, 1960 until the partnership was dissolved, and from that date until April 27, 1971, for Johnson, when she was discharged. During all that time she said that she "worked strictly under Mr. Johnson's directions". When asked why she was discharged, she answered:

"I was told by Mr. Gerald Roach that he was reorganizing the office and thus I was no longer with the company".

Johnson said:

"Mr. Roach fired Mrs. Bowers with my approval because she just wasn't capable of taking care of the job".

Mrs. O'Keiff was formerly married to Johnson's brother, Pat Johnson. She and Pat Johnson were married in 1967 and were divorced in November, 1973, because, in her own words, we "couldn't stand each other". The divorce proceedings were bitter and she did not think she received fair treatment with respect to the division of the property which was made in the decree. She blamed Johnson to some extent for the manner in which the property was divided.

 The testimony of a party to a suit is competent to raise an issue of fact. *Bishop v. Bishop*, 359 S.W.2d 869 (Tex.Sup. 1962). It is within the province of the trier of fact, the trial judge in the instant case, to judge the credibility of the witnesses and the weight to be given their testimony. *Austin Fire Ins. Co. v. Adams-Childers Co.*, 246 S.W. 365 (Tex.Comm'n App.1923, judgment adopted); *Smith v. State*, 490 S.W.2d 902 (Tex.Civ.App.—Corpus Christi 1972, writ ref'd n.r.e.). The testimony of Buck, Mrs. Buck, Mrs. Bowers and Mrs. O'Keiff, while not binding on the trial judge, was admissible, with the weight to be given it left to the trial judge.

### THE FINANCIAL CONDITION

 In summary, Buck testified that during the summer and fall of 1968, Johnson told him that their business was in deep financial trouble; that the tight money situation then existing made it virtually impossible to renew their short term notes that were coming due; that there was no market for the sale of Memorial City; that he had tried to sell the complex but had been unable to do so; that their business expenses exceeded the income from Memorial City; that the accounts payable were more than their cash on hand; that they could not borrow any new money; that their equity in the business was worth less than what they had represented it to be; that if they did not come up with $2,000,-000.00 outside money that they would lose their entire investment in Memorial City and "that it was just down the drain . . and there was no chance for it". To substantiate his prophecy of impending financial disaster, he exhibited to Buck a certain status report that had been prepared by Mr. C. J. Murphy, the accountant for the partnership.

According to the Murphy report, a projection of income for the year 1969 showed a deficit of over $1,780,000.00; that from January 1 through September 30, 1968, the partnership sustained an operating loss of $169,000.00; that the partnership needed $200,000.00 then and there to pay accounts payable; and that if all short term notes were paid, when due (in 1968), that Johnson and Buck would require almost $2,000,000.00. Murphy testified that the report encompassed a 5-year cash flow projection, commencing in early 1968.

Buck also testified that following several discussions with Johnson concerning the business generally and the Murphy report in particular, that Johnson represented to him that there was going to be a large operating loss for some time to come; that as a result neither of them could expect to draw any money out of the business for the next 5 or 6 years; that the best thing to do would be for one to buy the other out; and that their equity in the business was not worth more than $3,000,000.00.

Buck said that he accepted whatever values or figures that Johnson caused to be prepared for Memorial City; that he had nothing to do with preparing any financial statements and knew nothing about them or the financial condition of the business other than what Johnson told him; that he had always relied upon the financial statements prepared under Johnson's supervision as to the value of the Memorial City properties; and that he had no independent knowledge of the market value of the properties in Memorial City. He also stated that he relied upon the report and cash flow projections prepared by Murphy as correctly reflecting the true financial condition of the business.

Buck further testified that in 1968 he thought Memorial City was worth more than $3,000,000.00, but Johnson convinced him that it was not, and that he agreed to sell to Johnson solely because of the repre-

sentations made to him by Johnson as to the real net worth of the property. He said that during their discussions Johnson told him that he had never refused to consider any offers to buy the properties.

At the trial, Buck introduced testimony from competent and qualified witnesses that the projected cash flow documents, prepared by Murphy, were not in the customary and usual form; that they improperly included payments of principal on notes as expense items; that certain receipts which could have been reasonably expected were omitted; and that, as a whole, the cash flow projections were inaccurate and misleading. He contends that such inaccuracies helped conceal the fact that the business did not have to raise $2,000,000.00 in outside money in 1968, as represented to him by Johnson.

There is evidence that had the cash flow been properly projected by including all items that should have been included and excluding certain items that should not have been contained therein, that there would have been a positive cash flow projection rather than a negative cash flow for the years involved.

Mrs. Buck testified that in August, 1968, she had a discussion with Johnson pertaining to the business. She summed up the gist of that discussion, these words:

"And I asked him about the condition of the business, and he told me that the business was just going down the drain, that they were closing in on them; that they were unable to get any more tenants for the shopping center; that he had abandoned the hospital; that they were going to be unable to get their $250,000 from the Prudential loan because of the occupancy rate in the Professional Building; that as soon as the doctors learned of it that instead of signing leases they would be moving out; and that he was unable to get any permanent financing for the apartments; and that there were no sales to be made in the area, in the area of Memorial City Shopping Center;

and that their net equity was worth less than $3 million."

She further testified that in December, 1968, she was contacted by a person who told her that he had a party who wanted to look at the properties comprising Memorial City. She met with that person and told them she "thought that the center was possibly for sale". She then told Johnson that "there was a man in from out of town" who was interested in acquiring the Buck and Johnson properties. She then stated that Johnson told her:

" . . 'Oh my goodness, Bunny, please don't put that out on the street and don't shop these properties around. The best thing is not to even talk about them, because if it gets out on the street they will call in all of our loans and I will not even be able to pay Bob the $1,750,-000. So I beg of you not to shop it around.'"

Mrs. Buck said that she then asked how could the properties be worth only "a net of three million", when they had been representing to the lending institutions that their net equity was "around ten million", and that Johnson replied:

" . . that the conditions had changed drastically, that the Gibraltar was going to foreclose on the apartments; . . that he could not get any anchor tenants; that they had no sales for the properties . . that each partner would have to come up with something in excess of $1 million . . ."

Mrs. Buck said that she then "dropped it" because she believed what Johnson told her and relied upon him. Both Buck and Mrs. Buck said that if they had known that the properties were worth more than $3,000,-000.00 they would not have signed the instruments of sale on January 31, 1969, and on January 31, 1970, respectively.

Mrs. Bowers testified that during a conversation between Johnson and Buck, which occurred in the summer of 1968, she heard Johnson tell Buck:

". . . the business was in a very tight cash position . . . that they were going to have to come up with $1,000,000.00 very shortly . . . that the Professional Building would not be able to meet the occupancy requirements regarding the Prudential Loan . . . ."

Mrs. Bowers further testified that during the summer and fall of 1968 she received "many calls" from people who told her they were interested in purchasing all, or parts, of Memorial City, and that in each instance she noted the name of the party that called, the nature of their call, the firm that they were with, and what tracts they were interested in buying. She would then "hand-carry" the notes to Johnson. On one occasion, when a man wanted to buy the shopping center, Johnson, according to her, told her: "if the man called again to tell him that he was not interested in selling the shopping center at any price". On another occasion, she stated that a man came to the office, met with Johnson, and informed Johnson that he had two clients who were interested "in buying the shopping center, the apartments, as well as any other available properties that be for sale in the entire Memorial City complex". To which, she said that Johnson told him:

". . . none of the properties, the shopping center, as well as the apartments, were for sale at any price . . not for cash . . . not under any terms or any conditions".

Mrs. Bowers also stated that she did not inform Buck of any of the calls because:

". . . I had been instructed by Mr. Johnson not to do so."

Mr. W. Paul Holloday, Jr., the president of a local title company, who was called as a witness by Johnson, testified that he did not recall specifically that money was tight in 1967 and 1968, but it seemed to him "like business was pretty good" during those years.

Mr. Philip L. Kleas, president of Houston Mortgage Co. in 1968, testified that he solicited the loan business of Johnson in 1968, 1969 and in 1970, but that he did not do any business with him until 1970. He stated that the properties were outstanding; that "we had lots of money available; we would have loved to have made loans for him"; "we were actively in 1968, 1969 and 1970 soliciting all the business we could get"; that in 1969 the company could have loaned "probably $40,000,000.00 or $50,000,000.00" on Memorial City complex, since the company had "unlimited funds" at that time to lend on commercial properties and apartments. Kleas further testified that in 1968 and in 1969 he went to Johnson's office, and while he did not see Johnson, he told the secretary in the office that "we would like for Mr. Johnson to call us when he is in". Johnson did not return those calls, but in the latter part of 1970, Kleas was contacted by Johnson. A loan of $1,200,000.00 was then made by him on the apartments (120 units) which were built in 1968, and a loan of $1,250,000.00 was made on the 132 units thereof that were constructed in 1969.

Mr. Gerald Smith, President of Continental Bank § Trust Company, testified that the Bank made several loans (in the hundreds of thousands of dollars) to Buck and Johnson from 1964 through 1968; that the Bank did not cut off the credit of either; that the large sums of money previously loaned to them had been reduced by October, 1968, and that "if the transaction made sense", Buck and Johnson could have felt reasonably confident that they could have borrowed additional large sums of money if they needed it. He further testified that he made an unsecured loan to Johnson in the fall of 1968 in the amount of $250,000.00, to make the down payment to Buck on the purchase price of Buck's interest; that the Bank looked first to Johnson to re-pay the loan, and then to his assets, which, after the sale, included Memorial City. Additionally, the Bank made a $60,000.00 loan to Johnson in November, 1968, which was also unsecured. Buck was unaware of either of these unsecured loans.

The December 31, 1967 Financial Statement for Memorial City showed:

| "Assets | | $21,826,790.58 |
|---|---|---|
| Liabilities and Capital: | | |
| Liabilities | | 11,146,980.95 |
| Capital: | | |
| Robert L. Buck | $5,339,904.81 | |
| Joseph J. Johnson | 5,339,904.82 | 10,679,809.63 |
| | | $21,826,790.58" |

The December 31, 1968 Financial Statement for Memorial City showed:

| "Assets | | $23,853,927.34 |
|---|---|---|
| Liabilities and Capital: | | |
| Liabilities | | 12,892,458.19 |
| Capital: | | |
| Robert L. Buck | $5,480,734.58 | |
| Joseph J. Johnson | 5,480,734.57 | 10,961,469.15 |
| | | $23,853,927.34" |

The above-mentioned financial statements also had attached thereto land schedules. The net market value of the land, after deducting all notes payable against the land, was shown on the 1967 statement to be $5,876,155.87, and $4,953,610.41 on the 1968 schedule.

Mr. John Holloway, an attorney in Houston, testified that in the fall of 1968 or early 1969, he made an offer to purchase a certain tract of land in Memorial City for approximately $200,000.00 cash, but his offer was turned down by Johnson. Following that, Holloway said that he then attempted to buy other specific tracts at from $6.00–$3.75 per square foot, which offers were also turned down.

Mr. Michael J. Kahil testified that in August or September, 1968, he had a buyer who was interested in buying Memorial City Shopping Center, but that Johnson responded that he was not interested in discussing a sale of any part of it, "not even for cash".

Following a conference between Buck, Johnson and their attorney, wherein, according to Johnson, their "critical" financial situation was discussed, Johnson then consulted a Mr. Craig, a real estate broker, who reviewed the information concerning Memorial City's operating income, expenses and loans. Using cash flow as a basis, Craig put a value of $13,000,000.00 on Memorial City, and since it had liabilities of $12,000,000.00, Craig said that he would try to find a buyer at a price of $1,000,000.00, plus the assumption of the liabilities. Johnson further testified that he asked Craig in the fall of 1968 to sell the properties, who, in turn, contacted the Henry S. Miller Company in Dallas, a real estate company which handled large investment properties. According to Craig, a representative of the company inspected the properties, went over the financial information, and discussed the price at which he thought the shopping center could be sold. Although he said that the Miller Company put a gross value of $13,000,000.00 on the properties, Craig further said that he was not able to get that company interested in buying the properties at that price.

However, the record further shows that on cross-examination, Craig said that Johnson told him to sell Memorial City for:
". . . $15,000,000.00 . . . plus the assumption of the indebtedness . . ."

Johnson and Buck, in their briefs, place different constructions on the import of the above-quoted portion of Craig's testimony. Johnson claims that the testimony, of itself, clearly shows that the $15,000,000.00 includes the assumption of $12,000,000.00 then owed against the properties. He says

that the testimony can only mean a sale for a net of $3,000,000.00. Buck, in essence, contends that the testimony is, in effect, some evidence that the total sales price which Johnson authorized for the complex was actually $27,000,000.00, and that the assumption of the liabilities of $12,000,000.00 was in addition to $15,000,000.00 cash. Regardless of that, the above testimony as well as other testimony by Craig was before the trial judge.

Johnson testified that the status of the loans, both long term and short term, was discussed with Buck as a matter of almost daily business routine, and that he pointed out to Buck that they never knew if a note would be renewed until the time for renewal arrived. He also testified that his offer to purchase Buck's interest for $1,500,000.00 was simply what he would pay for that interest, and while he did consider to some extent what Craig had told him, his offer was not based on "any notion of market value".

Johnson vehemently denied that he had ever represented to Buck that the net value of Memorial City was not more than $3,000,000.00. He further denied that he made the statements which Buck, Mrs. Buck and Mrs. Bowers said he made. He testified that the Murphy report and the cash flow projections were true and correct as of 1968, when they were made, and that Buck, a shrewd businessman and a sophisticated investor, had access to the records in their office upon which such report was based. He said that he never told Buck that they could not obtain permanent financing on the properties, but that he did tell him that the short term note holders wanted their money as the notes became due, which statement was true in all respects. He insisted that he never did have a qualified buyer for the properties; he did, however, admit that Kahil possibly approached him in 1968 with a buyer, but he did not remember telling him or anyone else that the properties were not for sale, or that he had been approached by anyone to buy just a portion of the properties comprising Memorial City.

It is undisputed that the 1967 and 1968 financial statements were made under Johnson's direction. Johnson testified at the trial that neither the 1967 nor the 1968 financial statement for Memorial City represented the true market values of the properties, but only represented appraised values, which were about one-third higher than actual market values. He further stated that the values shown on the financial statements were accurate for the purposes for which they were prepared, and that the land values shown on the December 31, 1968 statement were about the same as the values for the same land in October, 1968. However, in his deposition, Johnson, in connection with the values of each tract of land listed in the 1968 financial statement, was asked:

"And on each one you carefully instructed them and determined before you signed it that it did represent that you thought it was the fair market value of the land, didn't it?"

His answer to that question was:

"Well, in 1968, when I signed it, I thought it was fairly accurate".

The values of the several tracts of land listed in the land schedule in each of the financial statements are set out in a column in each statement headed "FAIR MARKET VALUE". Even under Johnson's statements that the values were, in truth, one-third above market values, the net value of the land alone, as shown by the financial statements, in 1967 and 1968, was approximately $3,000,000.00.

There was never any foreclosure of any mortgage on any of the properties in Memorial City. The short term notes that fell due in 1968 were renewed, and new mortgages were obtained after 1968 for additional construction. Permanent financing was also obtained. The business did not go down the drain.

## THE NET EQUITY

We again advert to the financial statements in the files of "Buck & Johnson Enterprises", dated December 31, 1967, and December 31, 1968, which were sometimes

referred to as the "official" financial statements for those years. In June, 1968, Buck testified that Johnson presented a one-page handwritten document to him which showed a net equity for Memorial City in the amount of $2,851,757.00. He further testified that in October, 1968, Johnson told him that while the money received from the Globe transaction would be of some relief, that the condition of their business had not changed, and "that we were still worth less than $3,000,000.00". Shortly thereafter, Buck said Johnson presented another financial statement to him which was also a one-page handwritten document; it showed their net equity for Memorial City to be $2,946,752.00. Both documents were admitted into evidence.

With respect to those handwritten documents, the record shows the following questions asked of Buck and his answers thereto:

"Q. What did Mr. Johnson say to you when he gave you that exhibit?

A. He presented me the exhibit and said, 'Here, I have had prepared this condensed financial statement of the true market values of our equities, and made from recent and current financial statements that we have in the files it shows that our equity is worth less than $3,000,000.'

I had questioned that.

I said, 'Well, I thought we had always represented it was worth eight or nine.'

He says, 'I know, but this is the true market value of those equities at this time and it's made up from recent and current financial statements, that we have here in the office.' "

Johnson, when asked if in the last half of 1968 he had a financial statement which showed the net equity of Buck & Johnson based on market value to be $3,000,000.00, answered:

"I don't believe we had a financial statement, no".

Johnson further testified that the December 31, 1967 was "the latest financial statement" that he had in the files at the time he made the trade with Buck.

Mr. Murphy, when queried about the 1967 and 1968 financial statements, said:

"The statement that I said I prepared in '67, that was based on market value, or what we thought market values would have been, as was the one in '68. Now, whether another statement was prepared as of some cutoff date, I just don't recall".

In particular, he did not remember ever seeing a "financial statement for July, August, September, or October of 1968, which showed that the capital of the two partners was less than $3,000,000.00".

Mrs. Bowers testified that immediately following the disposition of the money which Johnson and Buck received when the Globe transaction was closed, she heard Johnson tell his attorney: "One of us has to go", and that he was referring to Buck. She further testified that the next afternoon Johnson and Buck had a discussion, and:

"I heard Mr. Johnson tell Mr. Buck that the net equity of the business was worth no more than $3,000,000.00. I heard him state immediately after that statement to Mr. Buck that he had an up-to-date statement based on market value to show this fact. And he then told Mr. Buck that the only thing he knew for them to do was for one of them to buy the other one out based on the $3,000,000.00 figure."

Mrs. O'Keiff testified that in the very early fall of 1968 (while she was still married to Pat Johnson):

". . . we were playing bridge over there one night, and Mr. Buck was being discussed, as was Memorial City. And I really was just half listening until Mr. Johnson says: 'we have almost got him (Buck). He can't hold out much longer. His back is to the wall. And then we will start developing, moving on in Memorial City' ".

\* \* \* \* \* \*

". . . The conversation continued, and Mr. Johnson mentioned a figure, a $1,000,000.00, or slightly over, I don't re-

member. I am not no business woman, but that seemed a little low, even to me, for Memorial City. So I said: 'is that a fair price for Mr. Buck's interest?' And he laughed and he said: 'the land alone was worth many more times than that'."

Johnson contends that the only witness who attempted to arrive at the net equity of the business in 1968 was Craig. His evidence has already been summarized. Craig was familiar with the contents of Johnson and Buck's 1967 financial statement for Memorial City, but he said that he did not base his opinion as to the value of the properties on the values shown on the financial statement, because:

"Knowing that financial statements are made mainly for the purpose of borrowing, they frequently do not reflect the true value".

He did, however, place a great deal of credence in the cash flow projections prepared by Murphy.

### THE APARTMENT LOAN

The Memorial City Apartments had been built with a $911,000.00 construction loan from Gibraltar Savings & Loan Ass'n. Buck and Mrs. Buck each testified that in the fall of 1968 Johnson represented to them that Gibraltar was insisting that the $911,000.00 loan on the apartments be paid; that if they did not repay the loan, when it became due, that Gibraltar would foreclose on the apartment property; and that it was impossible to obtain a permanent loan on the apartments. Buck further testified that Johnson told him that he had applied to McElvane Mortgage Company for a $1,000,000.00 permanent loan on the apartments but was turned down; however, Buck also said that Johnson did not disclose to him that McElvane at that time offered them a loan of $900,000.00 on the apartments for a period of 23 years at 7¾% interest.

Johnson had a somewhat different version. He said that he told Buck in 1968 that he had not been able to obtain satisfactory permanent financing on the apartments. He stated that he applied to McEl-

vane Mortgage Company for a $1,000,000.00 loan, and received an offer from it for a permanent loan in the amount of $900,-000.00 but that the offer was unacceptable because it was $11,000.00 less than what was needed, and also required the payment by Buck and Johnson of closing costs and points, which he estimated to be about $30,-000.00. There was testimony from other witnesses, who were called by Johnson, that at no time prior to January 31, 1969 could Buck & Johnson have obtained a million dollar loan on the apartments even at 8% interest. The record reveals that the Gibraltar $911,000.00 loan was moved to Farm & Home Loan Ass'n in January, 1969 and was put on a one-year basis.

Mrs. Bowers recalled that she heard "Mr. Johnson tell Mr. Buck that he tried to get a permanent loan on the apartments and that he was not able to even come up with a loan in the sum of $900,000.00".

### THE PLANS FOR THE HOSPITAL

For several years prior to 1968 Johnson and Buck had been working on plans for a 300-bed hospital in Memorial City. The hospital was to be adjacent to and would complement the Memorial City Professional Building. It was a planned integral part of the complex and was eventually built, though reduced from a 300-bed to 100-bed Hospital.

Buck testified that prior to October, 1968, Johnson told him "that the plans for the hospital had been completely abandoned, that it was impossible to build and operate a hospital profitably, and that he was absolutely unable to obtain a hospital profitably, and that he was absolutely unable to obtain permanent financing, and so we abandoned the idea altogether." He further testified that Johnson also told him at that time that they would not be able to collect the anticipated $250,000.00 or $260,000.00 part of the $1,600,000.00 Prudential Loan, because the loan was based on the occupancy of the Professional Building, and due to the fact that they were not going to build the Hospital, that they were not going to be able to rent the Professional Building, and that

there was a good possibility that they were going to lose the tenants they already had, because it had been represented to the tenants that the Hospital would be built along with the Professional Building.

Mrs. Buck testified that in August, 1968, Johnson told her that "he had abandoned the hospital". Mrs. Bowers said that sometime between June, 1968, and July 21, 1968, when Buck went to the hospital, during a conversation between Johnson and Buck in Buck's office, she heard Johnson tell Buck "that the hospital plans had been abandoned . . . that the Professional Building would not be able to meet the occupancy requirements regarding the Prudential Loan . . ."

Johnson contends that Buck's claim of misrepresentations with respect to the plans for the Hospital is so contrary to objective facts which existed at the time in question, which Buck knew or should have known, that his testimony must be disregarded as being incredible. In support of his contention, he argues that the presence of Mr. Howard E. Troutt and Mr. Robert T. Heisler in and out of Johnson and Buck's offices and the continuing meetings by Troutt with the doctors makes it highly unlikely that Johnson ever represented to Buck that the plans for the hospital had been abandoned.

Troutt came to work for Buck & Johnson as executive director of the planned Memorial City Hospital in May, 1968. He initially officed in the main office of Johnson and Buck but moved out of that office to the Professional Building in late 1968. At various times he worked on the plans for the Hospital; he also worked on the rentals incident to the operation of the Professional Building. He said that he did not have any detailed conversation with Buck with respect to his "function in the organization"; that he had several meetings with doctors with respect to plans for the formation of a limited partnership for the hospital, which plans were later dropped; that he thought that Buck "possibly" attended one or two of the meetings; but, he could not place the latest date when Buck was present at the meetings.

Heisler, the architect for both the Hospital and the Professional Building, testified that the plans for the hospital were never abandoned and that he continued to work on them until December, 1969, when the plans for the 300-bed hospital were shelved, and he began a study on a 100-bed hospital. The plans for the 100-bed hospital were completed in May, 1970, and the hospital was completed in 1971. He further testified that he never had any discussions with Buck about the Hospital between June and December of 1968. In 1968, he was in Johnson & Buck's office at Kingsride sometimes "two or three times a week; other times once a week." He consulted with Johnson only.

The mere presence of Troutt and Heisler in the offices, without more, does not render Buck's claim of misrepresentations incredible. Buck was not in the office almost on a daily basis as Johnson said. He was absent frequently. Troutt was not limited to work on the plans for the Hospital. His presence, being consistent with his work on the rentals for the Professional Building, should not of itself alone, have caused Buck to believe that the plans for the Hospital had not been abandoned. And, since Heisler was the architect for both Memorial City Hospital and Memorial City Professional Building at the time in question, his presence, as such, in the organization contributed nothing to what Buck should or should not have known about the plans for the Hospital.

## FOLEY'S AS AN ANCHOR TENANT

A real problem that confronted Buck and Johnson in 1968, according to Johnson, was the need for another "anchor" tenant in Memorial City. At that time they had Sears as the southern anchor tenant, but they needed another department store to anchor the north end of the shopping center to create traffic between the two stores. It is undisputed that Foley's did not actually agree to come into the shopping center until April, 1972, and that their store was opened in February, 1974.

Buck testified that sometime between June, 1968 and the time he went to the hospital later on in the summer of that year, that Johnson told him:

". . . there was no chance at all of getting Foley's; that our shopping center was just going to remain as it was for quite a long period of time."

Mrs. Bowers testified that in early 1968 she was told by Johnson to refer all calls with reference to anchor tenants such as Foley's (and others) directly to him, and not to "discuss" the calls with Buck, and that "he told me from that time on he was going to handle such matters". She also said that those instructions applied to "correspondence as well as calls, or any type of contact". She then stated that in the summer and fall of 1968 she referred calls from several people "who identified themselves as being associated with Foley's" to Johnson, and "he told me not to mention it to Mr. Buck", and that "he would take care of the Foley's calls". She further testified that in the fall of 1968 she overheard a conversation between Johnson and Murphy, and that Johnson told Murphy that he knew Foley's was interested in locating in the center and that they would come in under his terms.

Mrs. O'Keiff testified that in 1968 on several occasions, she was present at gatherings when Johnson mentioned his negotiations with Foley's, and that "Foley's was brought up quite often". She further testified that probably in "late summer, 1968", she asked Johnson "if he was going to pay Foley's to come into that shopping center", and he replied: "when Foley's came into that shopping center they would come in on his terms."

There is evidence that Federated Department Stores, the parent organization of Foley's, had, prior to October, 1968, ordered a "demographic survey" which covered, among others, the possible location of a Foley's store in Memorial City. During the trial, Johnson offered into evidence some handwritten notes that Mrs. Buck made during a meeting between her attorney and Mr. David Beurket, who was Federated's Real Estate Manager at the time and who had been so employed since early 1969. The trial court read the notes and admitted them into evidence. The notes are identified as Exhibit P–296. According to the notes, Beurket, at the meeting with Buck's attorney, said:

"I came to work in Oct. 1968 for Federated, and all of the demographics had been done by this time."

\* \* \* \* \* \*

"Demographics is the study of the economics of (sic) and Federated would never do these demographics, as it is very expensive, unless they had an agreement with all concerned".

He was then asked:

"By that, do you mean J. J., Fed., Sears & Montgomery Ward's?"

To which, he replied:

"Certainly, because if we did not have an agreement with the landowner it would be pointless to do all of the work & spend all of the money on research unless all agreed."

Also contained in Exhibit P–296 are the following questions asked of Beurket, and his answers thereto:

"Q. Did J. J. J. know of your plans to go into Memorial City in October, November or December of 1968?

A. Certainly, he knew and a tentative agreement had been made between Foley's, Sears, Montgomery Ward and J. J. J. by the time he came with Federated".

\* \* \* \* \* \*

"Q. What took so long before announcing your plans to come into M. C.?

A. There is always a lot of red tape in projects like this and I always felt that someone's feet were dragging; I won't say whose feet were dragging, though."

Even though Beurket, who testified by deposition, denied making those statements, Mrs. Buck testified to the contrary, and further testified that her notes of the meeting were accurate, and explained that "J. J.

J.", as used by her in the notes, meant Johnson. Beurket further testified that no one in Federated had the authority to negotiate real estate leases in shopping centers without his permission, and that his first contact with Johnson was in 1971 when he asked Johnson if he was interested in working with him on a proposal to be submitted to Federated. Those statements, though unchallenged and uncontroverted, do not rule out the possibility that Federated's Real Estate Manager before "early 1969", when Beurket assumed that position, might not have reached some tentative or preliminary understanding with Johnson in regard to locating a Foley's store in the center.

Mr. Milton S. Berman, the chief executive officer of Foley's, testified that he first met with Buck and Johnson sometime between 1964 and 1966, when they made a presentation to Foley's on Memorial City. He said that he expressed no interest in the matter at that time. But, he also testified that in October or November, 1968, he requested that a report on "Foley's Expansion Opportunities in the Greater Houston Market" be prepared, and that the report, when it was prepared, showed Foley's present location in Memorial City as a possible Foley's site.

Beurket's statements, as reflected by the notes, together with Berman's statement that he requested that the above-mentioned report be prepared, constitute evidence that some sort of survey of the Houston community concerning the possible location of Foley's stores in certain areas was ordered in the fall of 1968. That evidence will support an inference that some kind of agreement had been reached between Foley's and Johnson prior to October, 1968. The record shows that Foley's Real Estate Manager at that time (someone other than Beurket) could have entered into such an agreement with Johnson.

In addition to relying upon the testimony of Beurket and Berman as being conclusive that in 1968 Foley's had shown no interest in coming into Memorial City, Johnson also relies upon the testimony of Mr. John P. Sommers, who said that he had done leasing work for Buck and Johnson in Memorial

City since 1963, and that in 1968 he was in touch with a great number of the major stores in the Houston market, including Foley's, but was not successful in obtaining any of them as a tenant. The impact of Sommers' testimony is weakened somewhat by other evidence which reveals that major tenants (such as Foley's) were "handled" by Mr. Lane, Sommers' boss; that the services of Mr. Lane as the leasing agent for Memorial City terminated in June, 1968, and that in July, 1968, Mr. S. C. White was named manager of the leasing development for Memorial City, succeeding Lane. Neither White nor Lane testified.

The fact that Foley's may not have actually agreed to come into the shopping center until April, 1972, and Johnson's contentions that the store was obtained as a tenant wholly through his efforts after January 31, 1970, which, as stated in his brief, "finally turned around the fortunes of Memorial City complex", are not relevant to the misrepresentations and concealments of material facts allegedly made by him in 1968 and are not material to the value of the partnership properties as of January 31, 1970, when the partnership was terminated. The possibility of Foley's coming into the center was not given a money value on January 31, 1970.

## THE BUY–SELL OFFER

The only direct evidence concerning whether Johnson's offer to buy or sell for $1,500,000.00 was made in good faith is found in the testimony of Buck and of Mrs. Bowers.

Buck testified:

"Well, it had been determined that I wasn't in a position to buy Mr. Johnson out. He knew that. And he said he knew that . . ."

Mrs. Bowers testified, as follows:

"A. Mr. Buck told Mr. Johnson, I heard him say to Mr. Johnson that he did not have any idea as to his equity worth based on market value and that he would have to rely on Mr. Johnson for that.

Q. What did Mr. Johnson say?

A. He said, 'Yes, I know.'

Q. And then what did Mr. Buck say?

A. Mr. Buck said under the circumstances that he would take the $1,750,000."

\*　\*　\*　\*　\*　\*

"Q. Now, then after this conversation, did you have occasion to discuss the matter with Mr. Johnson?

A. Yes, sir; I took an occasion . . So I asked Mr. Johnson at the door if the company business was in such a tight cash position. I asked him if the Buck & Johnson Interests were really worth only $3 million like he had told Mr. Buck.

Q. What did Mr. Johnson say?

A. He said, 'No, but the million seven-fifty was more than the S.O.B. was entitled to.'

Q. Then what did you say?

A. I asked him if he would have really sold out to Mr. Buck for a million five.

Q. What did he say?

A. He said no, that he wouldn't have, that he knew that Mr. Buck couldn't buy him out."

## DISPOSITION OF THE FIRST SIX POINTS

The issues in this case were vigorously contested. The conflicts and contradictions between the testimony of the parties and that of their witnesses are extensive. There was evidence pro and con. The evidence was not consistent. It varied in each area with considerable degree. But, it is within the sole province of the trier of fact, who had the opportunity to observe the demeanor of the witnesses on the stand, to judge their credibility and the weight to be given their testimony, to resolve conflicts in the testimony of one witness with testimony of another witness, and to believe part of a witness' testimony and to disregard other portions of his testimony. *Royal v. Cameron*, 382 S.W.2d 335 (Tex.Civ.App.—Tyler 1964, writ ref'd, n.r.e.); *United States*

*Fidelity & Guarantee Co. v. Carr*, 242 S.W.2d 224 (Tex.Civ.App.—San Antonio 1951, writ ref'd); *Ohlen v. Hagar*, 212 S.W.2d 253 (Tex.Civ.App.—Fort Worth 1948, writ ref'd, n.r.e.).

The trial judge, where he is the trier of fact, may also draw reasonable inferences and deductions from the evidence adduced at the trial, and his findings, including implied findings, may not be disregarded by an appellate court if the record discloses evidence of probative value which, with inferences that may be properly drawn from the evidence, will reasonably support the same. *Peck v. Century Concrete Products, Inc.*, 375 S.W.2d 459 (Tex.Civ.App.—Fort Worth 1964, writ ref'd, n.r.e.); *Higginbotham v. O'Keeffe*, 340 S.W.2d 350 (Tex.Civ.App.—Amarillo 1960, writ ref'd, n.r.e.).

Where no specific findings of fact are requested or filed as is the case here, it is presumed upon appeal that the trial court found every issue of fact necessary to sustain the judgment when such fact issue is raised by the pleadings and finds support in the evidence, and such judgment will stand unless the appellant affirmatively shows that the undisputed evidence negatives at least one of the elements essential to support the judgment or shows that such findings are against the overwhelming preponderance of the evidence. *City of Center v. Roberts*, 469 S.W.2d 27 (Tex.Civ.App.—Tyler 1971, writ ref'd, n.r.e.); *Giles v. Wiggins*, 442 S.W.2d 839 (Tex.Civ.App.—Fort Worth 1969, writ ref'd, n.r.e.); *Flint v. Knox*, 173 S.W.2d 214 (Tex.Civ.App.—Galveston 1943, writ ref'd, w.o.m.). Johnson, who bargained from a position of advantage over Buck, his partner, did not meet his burden of proving that he did not misrepresent, conceal or withhold material facts in connection with his buy-sell offer.

A Court of Civil Appeals cannot substitute its judgment for that of the trier of fact, even though after reviewing the evidence it may have reached a different conclusion from that of the jury or the trial judge sitting without a jury. *Bardwell v.*

*Anderson*, 325 S.W.2d 929 (Tex.Civ.App.— Houston 1959, writ ref'd, n.r.e.); *Dyer v. Sterett*, 248 S.W.2d 234 (Tex.Civ.App.—San Antonio 1952, no writ). Nor may a Court of Civil Appeals pass upon the credibility of witnesses or substitute its findings for those made by the trial judge, or jury, as the case may be. *Burchfield v. Tanner*, 142 Tex. 404, 178 S.W.2d 681 (1944).

The credibility of the parties and their witnesses, the weight to be given their testimony, the nature of the relationship between the parties and the witnesses and the grounds for the existence of bias and prejudice on the part of witnesses, called by them was very pointedly brought to the attention of the trial judge. The many conflicts and contradictions presented by the evidence were resolved by the extremely able trial judge in favor of Buck.

We hold that there is ample evidence to support the implied findings of fact complained of by Johnson in points 1 to 6. They are not "against the great weight and preponderance of the evidence". Points Nos. 1 to 6, all inclusive, are overruled.

### LIMITATIONS

Buck testified he first learned that the net equity of Memorial City was more than $3,000,000.00 in March, 1972, when Gloria Baker, a former employee of Johnson, showed him a copy of Johnson's Financial Statement dated December 31, 1969. That statement showed the net equity of Memorial City to be $15,381,826.54. Buck filed the cross-action against Johnson on August 7, 1972.

Johnson, in point of error No. 7, claims that the judgment is improper because Buck's claims are barred by Tex.Rev.Civ. Stat.Ann. Art. 5526, the two-year statute of limitations. He contends that during the period June, 1968 through January, 1969, Buck knew enough facts about the condition of the business to suggest that the representations, if in fact made to him by Johnson, were not true, thereby placing a duty on Buck to investigate further. He argues that Buck's knowledge of such facts started the running of the two-year statute

of limitations more than two years before Buck filed the cross-action against him. Buck disputes Johnson's assertion that the evidence is uncontradicted that he was present in the office practically every day on a regular basis. He contends that there was nothing to cause him to doubt any of Johnson's representations until March, 1972, and that Tex.Rev.Civ.Stat.Ann. Art. 5529, a four-year statute, controls in an action for the reformation of an agreement, the execution of which was procured by fraud.

█ The relationship between partners is highly fiduciary in nature, and their dealings with each other are subject to the same scrutiny, intendments and imputations as a transaction between an ordinary trustee and his cestui que trust. *Archer v. Griffith*, 390 S.W.2d 735 (Tex.Sup.1964).

The Texas Supreme Court, in *Courseview, Incorporated v. Phillips Petroleum Company*, 158 Tex. 397, 312 S.W.2d 197 (1957), in an action for reformation of two instruments the execution of which was allegedly procured by fraud, held that in a fiduciary case, where the parties are not engaged in an "arms-length" transaction, limitations does not begin to run until the defrauded party has either actual knowledge of the fraud or has knowledge of facts sufficient to put him upon inquiry into the matter. The Court, in particular, noted:

"... In some situations there is no legal duty to use means available for discovering the fraud ..."

In *Franklin County v. Tittle*, 189 S.W.2d 773 (Tex.Civ.App.—Texarkana 1945, writ ref'd, it was held:

"... Where a relationship of trust and confidence exists between the parties, the rule is that limitations starts to run only from the time of actual discovery of the fraud ..."

This Court, in *Bush v. Stone*, 500 S.W.2d 885 (Tex.Civ.App.—Corpus Christi 1973, writ ref'd n. r. e.), where a purely technical fiduciary relationship did not exist, but a relationship of trust and confidence did exist, said:

". . . The mere fact that the defrauded party has the opportunity or power to investigate the fraud, is not sufficient to charge him with notice or knowledge of the fraud, so as to start the running of the statute of limitations. The question of the knowledge is a fact issue. Where there is a relationship of trust or confidence, the law, seems to impose upon the defendant the duty to make full disclosure of the facts so that the fraud may be discovered. If he doesn't do this, it has been held that the rule requires actual notice of the fraud before the limitation statute is set into motion . . ."

The Supreme Court of this State in *Isenhower v. Bell*, 365 S.W.2d 354 (Tex.Sup. 1963), reaffirmed the long-standing rule:

". . . Where one has been induced to enter into a contract by fraudulent representations, the person committing the fraud cannot defeat a claim for damages based upon a plea that the party defrauded might have discovered the truth by the exercise of proper care."

■ As managing partner of Buck and Johnson Enterprises, Johnson owed Buck, his co-partner, one of the highest fiduciary duties recognized in the law. *Huffington v. Upchurch*, 532 S.W.2d 576 (Tex.Sup.1976).

It is undisputed that Buck was in the hospital sometime in the summer of 1968. As already noted, he was frequently absent from the office from June, 1968 until early October, 1968, when the discussions with reference to the buy-sell arrangement commenced. There is testimony from Buck and from his doctor that Buck's physical condition from June until October, 1968, affected his ability to think and concentrate on matters at hand, which tended to cause Buck to rely on others' judgment and recommendations.

Johnson handled all matters pertaining to loans and fiscal affairs of the business. Buck had little, if any, specific knowledge of the business affairs or business conditions in 1968. It is established by the evidence that Buck trusted Johnson and relied

to a considerable degree on Johnson in all matters relating to their business.

Craig, Johnson's own witness, was asked if he ever noticed that Buck, at any time from 1962 to 1969, "was laboring under any mental disability whatever?" He replied:

"Well, I felt at different times that he wasn't completely familiar with the transactions, with all of the money that was owed, when they were due and where the various land tracts were financed, and I did feel that he was quite vague at times about a lot of it."

■ It was said in *Al Parker Securities Co. v. Owen*, 1 S.W.2d 271 (Tex.Comm'n App.1928):

". . . When inquiry is made of the highest source, and the inquirer is met with the reassurance of the truth of the representations, the injured party is not to be charged with a failure to exercise diligence to ascertain the falsity of the assurances. Such assurance constitutes an affirmative concealment of the fraud, and prevents the running of the statutes of limitations . . ."

That is the case here. Johnson was the highest source of information available to Buck. He did not choose "to do nothing", as asserted by Johnson. Instead, he went to Johnson for an explanation of what Johnson told him existed. Buck did not have actual knowledge that the representations made to him by Johnson were false at the time they were made (1968).

Applying the rules of the above authorities to this case, we hold that there was no legal duty on the part of Buck to use the means which Johnson claims were available to him to discover the fraud prior to the passage of two years from the date the misrepresentations and concealments of material facts were made, and that Buck was not required to make any investigation as to the truth or falsity of the representations made to him by Johnson in the summer and fall of 1968 until March, 1972. See *Moore v. Beakley*, 215 S.W. 957 (Tex. Comm'n App.1919, opinion adopted). There is ample evidence to sustain an implied finding that Johnson had superior knowl-

edge over Buck with respect to the business, its financial condition and the net equity in 1968. There is sufficient evidence to sustain an implied finding by the trial court that Buck did not learn of Johnson's concealments, or failure to make a complete disclosure of all facts, and the false representations of facts made to him by Johnson in the summer and fall of 1968 until March, 1972.

It is not necessary that we decide whether the two-year statute or the four-year statute of limitations applies to this case. Suit was filed by Buck within five (5) months after he was furnished facts that were sufficient to excite inquiry concerning fraud. Point No. 7 is overruled.

### OBJECTIONS BY JOHNSON

In point of error No. 8, Johnson asserts that the trial court erred in failing to sustain his objections to the qualifications and testimony of Buck's witnesses, H. F. Finley and Philip Kleas, on fair market value.

 It is largely discretionary with a trial judge as to whether a witness is qualified to testify as an expert, and whether comparable sales or leases should be admitted on the question of value. An appellate court should not disturb the action by the trial judge in the absence of a clear abuse of discretion. *Mobile Oil Corporation v. City of Wichita Falls,* 489 S.W.2d 148 (Tex. Civ.App.—Ft. Worth 1972, writ ref'd n. r. e.); *Harwell & Harwell, Inc. v. Rodriguez,* 487 S.W.2d 388 (Tex.Civ.App.—San Antonio 1972, writ ref'd n. r. e.); *Holcombe v. City of Houston,* 351 S.W.2d 69 (Tex.Civ.App.—Houston 1961, no writ). Generally, when a witness testifies that he is acquainted with the fair market value of the land involved, he is prima facie qualified to testify as an expert concerning such value and the question then arises as to the weight to be given such testimony by the trier of fact. *City of Houston v. McFadden,* 420 S.W.2d 811 (Tex. Civ.App.—Houston [14th Dist.] 1967, writ ref'd n. r. e.); *City of Teague v. Stiles,* 263 S.W.2d 623 (Tex.Civ.App.—Waco 1953, writ ref'd n. r. e.).

Finley had been in the real estate business in Houston continuously since 1947. He had a real estate license, and had been approved as a real estate appraiser by various agencies, federal, state and county. He had made appraisals for several financial institutions and had testified in court on many occasions concerning the value of real estate. In the course of his business, he kept up with real estate transactions in Houston. He testified that he was familiar with the Memorial City area and the land values in that part of Houston. In making an appraisal of Memorial City complex, he inspected both the improved and unimproved properties thereof. He studied the sales and leases in the complex and in comparable areas, and stated, in substance, that they were sufficient for him to place a value on the properties in Memorial City. Apparently, he valued each tract separately. After deducting one-half of the indebtedness against the properties, Finley's opinion on the fair market value of Buck's net equity therein on January 31, 1970, including both improved and unimproved properties, was $6,429,581.27. His appraisal, however, did not include the value of non-real estate items which were shown on Buck and Johnson's December 31, 1968 Financial Statement. Buck's interest therein when added to the total value placed by Finley on the properties appraised by him, would have resulted in a net equity to Buck considerably in excess of seven million dollars on January 31, 1970.

 Kleas, who had a real estate license, had been in business in Houston for some 30 years prior to time of trial. He was President of Houston Mortgage Company, about a fifty million dollar company, when it was sold in December, 1971. He testified that during his tenure as president of the company, he was familiar with real estate and the value of real estate in Houston, and he had during the past 30 years, personally evaluated thousands of residences and many commercial properties for the purposes of making loans on such properties for either Houston Mortgage Company or some of the biggest loan companies in America. He further testified that he was

familiar with the value of the land in Memorial City on January 31, 1970; that he was familiar with loans and the values of shopping centers in Houston other than Memorial City Shopping Center; and that as a result of his investigation he had an opinion as to the value of the *entire area* of Memorial City complex on January 31, 1970. He stated that the fair market value of the land area of Memorial City on January 31, 1970, excluding the buildings thereon, was $20,500,000.00, and that there was no change in the value of such land between December 31, 1969 and January 31, 1970. He also said that the fair market value of the complex on January 31, 1970, including improvements, was $29,000,000.00. Such testimony was clearly admissible as an expert opinion on value of the entire tract of 165 acres upon which the improvements were built; the testimony furnishes a basis for the valuation of the land as a unit; the value of the improvements is shown to be limited to the extent that it enhanced the value of the land as a unit. See *Gill v. State,* 531 S.W.2d 322 (Tex.Sup.1975).

The fair market value of the complex, including both improved and unimproved properties, of $29,000,000.00 as of January 31, 1970, placed thereon by Kleas, did not include other properties, largely personal properties, which, according to other evidence was worth $1,599,611.31. Adding those values to the $29,000,000.00 would, in effect, put a value of $30,599,611.31 on Memorial City. If the liabilities as of January 31, 1970, about which there is no dispute, is subtracted from the thirty million dollars plus value, then the net equity would be $14,952,702.26.

■ Even if, as Johnson argues, that Finley, in arriving at his appraisal, valued each lot in Memorial City separately and did not place a value on the complex as an entirety, and, therefore, it was error to introduce such testimony into evidence, the error, if any, is not a ground for reversal and remand. The testimony of Kleas and Johnson's December 31, 1969 Financial Statement, hereinafter discussed, each furnish competent and probative evidence that

Buck's net equity in Memorial City, on January 31, 1970, was more than the amount testified to by Finley. The judgment award can be sustained without considering Finley's testimony. When the entire record is considered, we cannot say that the admission of Finley's testimony as to value into evidence was reasonably calculated to cause and probably did cause the rendition of an improper judgment in the case. Rule 434, T.R.C.P.

■ We conclude that Finley and Kleas were eminently qualified as expert witnesses with respect to the fair market value of Memorial City properties. No abuse of discretion is shown by permitting them to express their opinion on matters of fair market value of the partnership properties. Point No. 8 is overruled.

## THE MEASURE OF THE AWARD

Johnson's point of error No. 14 reads: "The damage award is improper and the case must be remanded because the trial court utilized the wrong measure of damages and there is no evidence in the record as to the correct measure of damages."

■ Since a fiduciary relationship existed between Johnson and Buck because of their being partners, the agreement of sale, as between them, which was accomplished by misrepresentations and concealments of material facts which induced the sale, is a nullity. "Under such conditions, equity indulges the presumption of unfairness and invalidity". *Stephens County Museum, Inc. v. Swenson,* 517 S.W.2d 257 (Tex.Sup.1974).

■ The law is well settled that a person who has been induced to enter into a contract because of misrepresentations or concealments of material fact to his detriment, upon the discovery of the fraud perpetrated upon him, has a choice of two remedies: 1) he may affirm the contract and sue for his damages; or 2) he may rescind the contract. *Dallas Farm Machinery Company v. Reaves,* 158 Tex. 1, 307 S.W.2d 233 (1957); 37 C.J.S. Fraud § 65, pp. 354–358.

**416**

■ Where a partnership has terminated, and there is a dispute as to the fairness of the disposition of the partnership properties, the complaining party has the remedy of a suit for an accounting and settlement of the partnership affairs in accordance with Tex.Rev.Civ.Stat.Ann. Art. 6132b, § 42. See *Thompson v. Duncan*, 44 S.W.2d 904 (Tex.Comm'n App., 1932); *Cauble v. Handler*, 503 S.W.2d 362 (Tex.Civ.App.— Fort Worth 1973, writ ref'd n. r. e.); *Rice v. Lambert*, 408 S.W.2d 287 (Tex.Civ.App.— Corpus Christi 1966, no writ).

■ In this case, Buck elected to rescind the instrument of sale, and to sue for an accounting between him and Johnson as of January 31, 1970, when their partnership terminated, without regard to the agreement reached in 1968 and the instruments of sale subsequently executed by him in accordance with that agreement. The trial court conducted such an accounting, set aside the instruments of sale, and awarded Buck a money judgment which was the equivalent of a one-half interest in the net equity in the partnership as of January 31, 1970. The trial judge was fully authorized and empowered to render such judgment under the pleadings and proof here presented. There being no valid sale, and the instruments of sale having been set aside by the trial court because of their invalidity, the partnership was terminated under the undisputed evidence on January 31, 1970 without any valid sale of Buck's interest in the partnership properties to Johnson. The judgment was not for damages and was not rendered on any theory of damages, but was a judgment for the net value of Buck's interest in the partnership properties on the date the partnership was terminated, which settled the disputed matters in the suit for accounting, less the amount of money that was paid to Buck under the invalid instruments of sale, and less certain moneys due Johnson as offsets. Point No. 14 is overruled.

## THE JUDGMENT AWARD

Johnson, in points of error 9, 10, 11, 12 and 13, his remaining points, asserts that there is no probative evidence to sustain the judgment award, that the award is so against the great weight and preponderance of the evidence as to be wrong and unjust; that assuming that Johnson did misrepresent and conceal material facts from Buck or that he failed to disclose material facts to him, to Buck's detriment, it is impossible for this Court to determine from the record the amount by which the finding is excessive on any material date which prevents the granting of a remittance; that the award is so excessive as to shock the conscience of this Court and that the cause should be remanded for a new trial; or, alternatively, that this Court should order a remittance of an appropriate amount of money as a condition to affirmance. None of the points can be sustained.

■ Under the record here presented, we must affirm the action of the trial court if the amount of money awarded by the judgment can be sustained on any theory which finds support in the evidence. *Seaman v. Seaman*, 425 S.W.2d 339 (Tex.Sup. 1968); *Bishop v. Bishop*, 359 S.W.2d 869 (Tex.Sup.1962).

■ The opinions of Finley and Kleas concerning the net fair market value of Memorial City on January 31, 1970, find support in Johnson's December 31, 1969 Financial Statement. That document, in a section thereof entitled "MEMORIAL CITY BALANCE SHEET", contained the following representations concerning the properties:

"TOTAL ASSETS $31,028,735.59
LIABILITIES AND CAPITAL
 Liabilities $15,646,909.05
 Capital 15,381,826.54
TOTAL LIABILITIES AND
 CAPITAL $31,028,735.59"

Attached thereto is an affidavit, executed by Johnson, the pertinent parts of which read:

" . . . the undersigned hereby guarantees and affirms that the financial statement dated December 31, 1969,

. . . is true and correct in all particulars, that the assets therein set out are fairly and reasonably appraised as to value . . ."

"/S/ JOSEPH J. JOHNSON"

The financial statement has a direct bearing on the value of the partnership properties at the time in question, and properly constituted evidence which was before the trial judge for his consideration in determining the value of the properties at the time the partnership was terminated. *West v. Houston Lighting and Power Co.*, 483 S.W.2d 352 (Tex.Civ.App.—Houston [1st Dist.] 1972, no writ); *State v. Stiefer*, 443 S.W.2d 275 (Tex.Civ.App.—Tyler 1969, writ ref'd n. r. e.); *Culver v. State*, 324 S.W.2d 921 (Tex.Civ.App.—Fort Worth 1959, no writ).

Buck was entitled to an accounting with Johnson, without regard to the sale and instruments executed pursuant to their 1968 agreement. The trial court conducted such an accounting and rendered judgment pursuant to such an accounting.

Johnson's claims that the business was a joint venture and not a partnership, that the business venture in fact terminated on December 31, 1968, and that the instruments of sale, being executed in 1969 and in 1970 as an accommodation to Buck, should not be construed as terminating the business on January 31, 1970, are without merit. The business, as we have heretofore held, was a partnership. The record shows that it was not terminated until January 31, 1970. A partnership income return for "Buck & Johnson Enterprises" was filed for the calendar year 1969; a similar return, marked "FINAL RETURN", was filed for that portion of 1970 that the partnership was in existence. As evidence that the partnership did not terminate until January 31, 1970, both returns, signed by Johnson, showed that he and Buck were equal partners, that each devoted "part" of his time to the business, and the "operating loss" sustained by the partnership was allocated to each in equal shares.

■ The fair market value of Buck's net equity in the partnership properties, adjusted to January 31, 1970, less the amount of money paid to him as a result of the invalid agreement of sale, and after the allowance of all offsets shown by the proof to be due Johnson, amply supports the judgment award of $6,377,365.89 to Buck. The amount thereof is not against the great weight and overwhelming weight and preponderance of the evidence. Points 9 and 10 are overruled.

■ In determining whether the amount of a judgment is "excessive", an appellate court reviews only the evidence that is favorable to the award. The findings by the trier of fact will not be disturbed on the ground of "excessiveness" if there is any probative evidence to sustain the award. *Hammond v. Stricklen*, 498 S.W.2d 356 (Tex.Civ.App.—Tyler 1973, writ ref'd n. r. e.); *Monsanto Company v. Milam*, 480 S.W.2d 259 (Tex.Civ.App.—Houston [14th Dist.] 1972, aff'd 494 S.W.2d 534 (Tex. Sup.1973); *Sunset Brick & Tile, Inc. v. Miles*, 430 S.W.2d 388 (Tex.Civ.App.—Corpus Christi 1968, writ ref'd n. r. e.). The mere fact that the amount of money awarded by the judgment is large does not render it conclusive that the amount determined to be due is the result of passion, prejudice, sympathy or other consideration not found in the evidence. *Hammond v. Stricklen*, supra; *Union Transport, Inc. v. Braun*, 318 S.W.2d 927 (Tex.Civ.App.—Eastland 1958, no writ).

We have reviewed all of the evidence and find nothing in the record to show bias, prejudice or other improper motive on the part of the trial judge that would warrant our disturbing the judgment in this case. The amount of the judgment award is not excessive, is fully supported by the evidence, and does not offend the conscience of this Court. See *McIver v. Gloria*, 140 Tex. 566, 169 S.W.2d 710 (Tex.Sup.1943); *Dallas Consolidated Electric St. Ry. Co. v. Motwiller*, 101 Tex. 515, 109 S.W. 918 (1908); *Sunset Brick & Tile, Inc. v. Miles*, supra. The facts of this case do not suggest or warrant a remittitur as a condition of affirmance. Points Nos. 11, 12 and 13 are overruled.

The judgment of the trial court is AFFIRMED.