CARROLL INSTRUMENT COMPANY, INC., Appellant,

v.

B.W.B. CONTROLS, INC., Appellee.

No. 01–83–0399–CV.

Court of Appeals of Texas, Houston (1st Dist.).

Aug. 16, 1984.

Larry Mason Lee, Colvert, Lee & Associates, Houston, for appellant.

Robert W.B. Dickerson, Dickerson & Davis, Houston, for appellee.

Before EVANS, C.J., and LEVY and DOYLE, JJ.

OPINION

LEVY, Justice.

B.W.B. Controls, Inc., hereinafter referred to as appellee, placed an order with appellant, Carroll Instrument Co., Inc., in 1976 for certain component parts which were to be manufactured into a device used in the oilfield industry, known as an "O Control." The parties agreed on the price and quantity of the parts to be purchased, and appellee paid approximately one-half of the purchase price as a deposit.

The parties specified that the parts were to be made of a certain type of rust-resistant stainless steel ("303" stainless steel), but some of the parts, shipped to appellee in December of 1976, began to rust at a later date, after being assembled into the completed unit. This rusting made the O Controls useless, and potentially hazardous, as they could no longer function as designed. Appellee ultimately replaced the rusted controls with units manufactured by another company, at considerable cost. After refusing to pay the balance owed on the account, appellee was sued by appellant in an action on a sworn account. Appellee affirmatively pleaded a breach of warranty of merchantability and of fitness for a particular purpose, and counter-sued for damages incurred as a result of having to replace the defective parts.

Trial was held to the court in March, 1983, and judgment was entered by the trial court that neither party was entitled to recovery. Only the appellant has appealed its portion of the judgment denying relief; appellee has not.

As we interpret the parties' arguments, the crux of this appeal is whether, first of all, the parts in question were made of "303 stainless steel," as specified in the order; and if not, whether appellee, after discovering the rusted stems, ever notified appellant of the defect, and gave it reasonable time to cure the defect. We will address appellant's points of error in three separate arguments. Points of error one through six address the issue of whether sufficient notice was given to appellant of

the rusting parts to satisfy the requirements of Tex.Bus. & Com.Code Ann. § 2.607. Points of error seven and eight deal with appellee's establishing of a complete defense to appellant's claim for damages. Finally, points of error nine through thirteen challenge the trial court's finding that the defective component parts were not made of 303 stainless steel, and that 303 stainless steel does not rust.

On the subject of notice, we first note the certain provisions of the Texas Business and Commerce Code that are applicable, specifically those dealing with the rights and obligations of buyers and sellers, and the rejection of goods.

Section 2.602(a) provides that:

Rejection of goods must be within a reasonable time after their delivery of tender. It is ineffective unless the buyer seasonably notifies the seller.

Section 2.607(a), Tex.Bus. & Com.Code Ann., provides that if the goods are accepted, the buyer must pay for the goods at the contract rate. Section 2.607(c) provides that:

Where a tender has been accepted (1) the buyer must within a reasonable time after he discovers or should have discovered any breach notify the seller of breach or be barred from any remedy ...

Appellant argues in points of error one, two, and six that the trial court erred in finding that appellant received notice from appellee via Joe Taylor that the component parts were rusting. Related to this are points of error three and four, which challenge the trial court's finding that Joe Taylor was an agent of appellee for purposes of giving said notice. Appellant urges no evidence and insufficient evidence to support both of these findings.

■ Where legal insufficiency points are raised and the challenge is to "no evidence", the appellate court is charged with reviewing only the evidence which tends to support the finding, viewing it in the most favorable light in support of the finding. The court must also give effect to all reasonable inferences that may be drawn properly from the findings, and must disregard all contrary or conflicting evidence. *McClure v. Allied Stores of Texas*, 608 S.W.2d 901, 904 (Tex.1980); *Butler v. Hanson*, 455 S.W.2d 942, 944 (Tex.1970); *Garza v. Alviar*, 395 S.W.2d 821, 823 (Tex.1965).

■ On the other hand, where factual insufficiency points are raised, alleging "insufficient evidence", the appellate court is charged with examining all the evidence in the record that is relevant to the fact being challenged, including any evidence to the contrary. *In re King's Estate*, 150 Tex. 662, 244 S.W.2d 660 (1951).

Reviewing the record before us, we find that the evidence is conflicting on the issue of notice, even from the appellant itself. Initially Joe Carroll, President of Carroll Instrument Co., testified on cross-examination that the first time he became aware that there was a problem with the parts in question was during the deposition taken for purposes of the lawsuit in 1982. Later on he testified that he was "told of some problem rusting by Mr. Joe Taylor of Control Pilots, Inc." In response as to *when* he was informed of this, he replied "... he brought a part to my shop roughly, I would estimate, a month after I delivered the parts to B.W.B., and we discussed the fact that it was off color, not rusted." An objection was sustained that the answer became nonresponsive after the statement of date, and this was ordered stricken from the record.

Later testimony went as follows:

Q. So it is now your testimony that one month after the time of delivery of product to B.W.B. Controls ...., one month after your delivery you became aware of a problem regarding rusting stems; is that correct?

A. (by Mr. Carroll) Yes. But they may or

Q. —

Appellee's attorney evidently cut Carroll off, because there followed a discussion as to why Carroll should have been allowed to explain his answer. The court, however,

did not strike any portion of that response from the record.

Carroll later testified that the appellee did not make demand upon him for correction of the problem between the date of delivery of the product and the time of trial.

On redirect, Carroll testified that he was never contacted by Ned Bergeron (the President of B.W.B.) or anyone from B.W.B. and asked to take back any parts, or to refund any money paid to them nor did anyone from B.W.B. ever complain to him that the parts did not work. He further testified that he could have traced the allegedly defective materials back to where they were manufactured, had anyone come to him from B.W.B. and said there was a problem with the rusted stems, but that he was denied that opportunity by the lack of complaint.

In contrast, Bergeron testified that he first found out there was a problem with the stems shortly after delivery and that his company informed appellant that the problem existed. In response to questions about Carroll's resolution of the matter, he testified:

Q. Did Mr. Carroll indicate to you what Carroll Instrument Co.'s position was with regard to replacement of this defective product?

A. I sent Mr. Taylor with a product to Carroll Instrument Co. I had a negative response.

At a later point the testimony was as follows:

Q. and you didn't call Mr. Carroll?

A. No, I got in touch with Mr. Taylor.

Q. ... you did not call Joe Carroll and say, Joe, we have a problem, we need to replace the stems?

A. I only met Mr. Carroll on one occasion prior to that, I did not know Mr. Carroll. I worked—I made the order. Joe Taylor knew Mr. Carroll. I said, "work it out." It was not worked out.

█ Ordinarily, notice is a question of fact which is to be determined by the trier of fact; it becomes a question of law only where there is no room for ordinary minds to differ as to the proper conclusions to be drawn from the evidence. *Crystal City Independent School District v. Crawford*, 612 S.W.2d 73 (Tex.Civ.App.—San Antonio 1981, writ ref'd n.r.e.); *Exxon Corp. v. Raetzer*, 533 S.W.2d 842 (Tex.Civ.App.—Corpus Christi 1976, writ ref'd n.r.e.). In instances where the evidence is conflicting or consists solely of testimony of interested parties, it is the function of the trial court in non-jury trials to weigh the evidence and determine the true facts. *Permaspray Mfg. Corp. v. Permaspray Mfg. Corp.*, 490 S.W.2d 866 (Tex.Civ.App.—Fort Worth 1973, no writ). And, where the evidence is conflicting, the reviewing court is bound by findings of the trier of fact. *Fender v. Schaded*, 420 S.W.2d 468 (Tex.Civ.App.—Tyler 1967, writ ref'd n.r.e.). Furthermore, the findings of the trier of fact may not be disregarded if the record discloses any evidence of probative value which, with inferences properly drawn, would reasonably support same. *Johnson v. Buck*, 540 S.W.2d 393 (Tex.Civ.App.—Corpus Christi 1976, writ ref'd n.r.e.); *Sentry Development Corp. v. Norman*, 553 S.W.2d 664 (Tex.Civ.App.—Tyler 1977, writ ref'd n.r.e.).

█ Appellant argues that the fact Carroll was told of some "problem" a month or so after delivery is not sufficient to give notice, because the term "problem" is so vague as to be meaningless. Evidence was presented, however, that Taylor took one of the products with him to show Carroll. It is not essential under Section 2.607, Tex. Bus. & Com.Code Ann., that the buyer's notification of a defective product specifically set forth in detail *every* objection the buyer has to the fitness of the product; it is only necessary that the seller be informed that there is a claimed breach of the warranty of fitness.

█ We find appellant's argument unpersuasive, and accordingly conclude that if Taylor had a sample part with him when he went to visit appellant's President, and

it was rusting, that Carroll certainly would have been made aware of the exact nature of the "problem."

The appellant raises another argument related to the notice question, arguing that appellee exercised such "control and dominion" over the parts as to constitute acceptance of the parts. *Explorer's Motor Home Corp. v. Aldridge*, 541 S.W.2d 851 (Tex.Civ. App.—Beaumont 1976, no writ). Appellant argues that appellee could not have given notice of the defect or have rejected the parts, because appellee continued to sell the parts after the supposed notification took place.

Important to the discussion on control and dominion of the parts is the question whether the allegedly defective parts could have been immediately discovered or whether the defect was more of a latent defect, which would show up later, but not immediately.

Section 2.605, Tex.Bus. and Comm.Code Ann., states that:

a) The buyer's failure to state in connection with rejection a particular defect which is ascertainable by *reasonable inspection* precludes him from relying on the unstated defect to justify rejection or to establish breach,

(1) where the seller could have cured it if stated seasonably. (Emphasis added).

The testimony indicates that it is difficult, if not impossible, to tell just from looking at a part whether it is actually made of stainless steel. Carroll testified that he could not tell by looking whether a product was manufactured of stainless steel or not. He further testified that appellant's inspection of the product prior to shipping to appellee did not involve any testing as to whether the stems were made of stainless steel.

Bergeron testified that someone in his organization inspected the parts before they were assembled to go out into the field, but that they did not *test* the parts to determine whether they were stainless steel or not. Furthermore, he testified:

A new piece of control steel just off the machine shop, or just a couple weeks off the machine shop, or a piece of stainless steel look identical. They weigh about the same, they look the same. Both of them are shiny until rust has had time to get into the metal. No way me or any of my employees could tell the difference.

Appellant argues that the fact that appellee sold 63 completed units to Placid Oil Co. in 1977 is evidence of appellee's control and acceptance of the parts. Bergeron did testify that 63 units went to Placid Oil Co. in 1977. However, there was no evidence in the record as to *when* in 1977 these were sold to Placid. Since the parts were not delivered to appellee until December, 1976, a 1977 sale to Placid could be insignificant if it had occurred in early 1977.

Appellant further urges that appellee would never have continued to sell the parts if they felt they were defective. An examination of the record reveals the following illuminating testimony from Bergeron:

Q. So, at any rate, what you're saying is a hundred of these units went out pretty close to the same time in December of '76?

A. No, it takes a couple weeks to get them back, polish them, grease them, test them, put "O" rings on them. They may go to ABC Panel Co. or F. Panel Co. or G. Panel Co. and these people may have them in their shop for a period of six months while assembling all the difficult components, and then they are finally shipped overseas—or not overseas, to the offshore platform, and they are installed into the system.

Further questioning regarding replacement of the defective parts went as follows:

Q. It took roughly 9 months to replace that one?

A. Well, yes.

Q. What is the next one?

A. I had to wait until he manufactured them to to be able to go out and

replace them. Some of them I didn't even know where they were at until 5 or 6 months afterwards. We had to send letters out saying that this type of relay is not good.

Continuing on, Mr. Bergeron testified:

Q. Do you recall in other words, some of them worked for a long time?

A. No, no some of them didn't work at all.

Q. But some of them worked for 9 months?

A. No, No. The ones that we found out about soon, we replaced them as soon as we could. Some of these were still in crates, at a panel company's office waiting for assembly to put into the panel to go offshore.

■ We find that the above quoted testimony shows a sequence of events which indicates that the parts could already have been sent to panel companies to complete further assembly, prior to discovery of the defect. Thus, we reject appellant's argument relating to the control and acceptance of the parts.

We also find sufficient probative evidence to support the trial court's findings regarding notice, and accordingly overrule appellant's points of error one, two, and six.

■ Appellant's third and fourth points challenge the court's finding that Joe Taylor was appellee's agent for purposes of giving notice to appellant. Examining the record, we note that Bergeron testified that he specifically sent Taylor to discuss the matter with Carroll, that he told him "to work it out," and Carroll admitted that Taylor brought a part to his shop, which they discussed. Extensive testimony was also presented by Bergeron showing the extent that Taylor had been previously involved in the final products' inception. Taylor apparently helped design the final product, prepared the drawings for it, and had communicated on previous occasions with Carroll on certain specifications for the product. An agency relationship shown to have once existed is ordinarily presumed to have continued. *Bouldin v. Woosley*, 525 S.W.2d 276 (Tex.Civ.App.—Waco 1975, no writ). We find more than sufficient probative evidence that Taylor was appellee's agent for purpose of notification. Moreover, appellant's attorney admitted the agency of Taylor to the court in one of his arguments to let in certain excluded testimony:

> MR. McCARTY: ... On the first ground, by his last testimony he has testified that there was a connection between Mr. Joe Taylor and B.W.B. Controls. And in fact, B.W.B. Controls, Mr. Bergison [sic] president of the company, had instructed him to talk to Mr. Taylor, thereby making Mr. Taylor an agent for the purpose of discussing these particular areas of the connection between the products.

McCarty's statement was deliberate, clear and unequivocal, and would appear to be a judicial admission, binding appellant to the position stated. *Texas Processed Plastics, Inc. v. Gray Enterprises, Inc.*, 592 S.W.2d 412 (Tex.Civ.App.—Tyler 1979, no writ); *National Savings Insurance Co. v. Gaskins*, 572 S.W.2d 573 (Tex.Civ.App.—Fort Worth 1978, no writ).

We, therefore, affirm that there is sufficient evidence to support the finding that Taylor was appellee's agent.

Appellant's third and fourth points of error are overruled.

Appellant's fifth point of error complains of the exclusion of certain testimony of Carroll relating to his conversation with Joe Taylor, which has properly been preserved by a bill of exceptions. In particular, appellant complains of the court's exclusion of opinion testimony of Taylor as to whether stainless steel could be of different colors. Appellant, in his brief, has reproduced the entire bill of exceptions, plus the court's subsequent ruling on the use of such testimony. The court clearly stated the only statement it would not consider was:

> one statement that this witness repeated allegedly made by Mr. Taylor that was a summary of his testimony concerning his

opinion as to whether or not steel could be off color. That statement which I classify as both hearsay and unsubstantiated opinion, the Court will not consider. The Court will allow in and will consider, now that it has been introduced on a Bill, the other testimony of this witness that was introduced on the Bill, because none of it comports opinion ....

Examining the entire bill, we find that the only testimony not considered by the trial court immediately followed this introductory inquiry:

Q. Mr. Carroll, what did Mr. Taylor tell you when he brought in this (indicating), whatever he brought you as you testified previously on cross-examination?

A. Mr. Taylor brought me a part that was supposed to be a part of a control that had come back from BWB Controls that was off color and not rusted.

The following testimony was excluded:

Q. (By Mr. McCarty) Go ahead.

A. And he asked me could stainless steel be of different colors, and I didn't know. We both discussed it.

He has quite a metallurgical background. He didn't know the answer, I didn't know the answer, and that was the substance of that talk.

Appellant argues that Taylor's excluded opinion, as to whether stainless steel could be off-color, should have been admissible as an exception to the hearsay rule. Appellant urges that this testimony was not offered for the truth of the matter asserted, *i.e.*, that steel could be off-color, but to show that its color did not concern Taylor to the extent that it would constitute a defect requiring notice.

We agree that this specific reference to stainless steel being off-color would not constitute hearsay, and would have been admissible as an operative fact, *i.e.*, to show the extent of notice given. However, we do not find the asserted error to be of such a magnitude as to require reversal of this cause. Rule 434, Tex.R.Civ.Pro. We

so hold particularly in light of the fact that the trial court did consider the testimony by Carroll that Taylor did *not* tell him that there was a "problem" with rusting, and therefore the product was not working. This evidence shows the extent or lack of notice given, according to Carroll. Thus, the exclusion of the "off-color" discussion would be harmless error, at most.

Appellant's point of error five is sustained, but we hold the error, if any, to be harmless.

Appellant, in points of error nine through thirteen, challenges the legal and factual sufficiency of the evidence to support the trial court's finding that the component parts supplied by Carroll were not made of 303 stainless steel and that 303 stainless steel does not rust in the Gulf Coast environment. Reviewing all of the evidence on these points, including any evidence to the contrary, *In re King's Estate, supra,* we find sufficient evidence to support the trial court's findings, although it is conflicting. Carroll himself acknowledged that all previous orders for these parts had been made of 303 stainless steel and that none of those had rusted. This particular order was also to be made of 303 stainless steel, and Carroll admitted that there had to be some difference in the product provided on this particular order if these rusted and previous ones did not.

Ned Bergeron testified that in his 15 years of working in the oilfield control business, he had seen thousands of controls made out of 303 stainless steel, and none of those controls had ever rusted before.

George Warren, Vice President of Sales for B.W.B., testified that in his 4 years of directly handling this type of equipment, he had seen thousands of these types of controls made out of stainless steel, and none of them had ever rusted. He testified that during his experience working on these types of controls, he had serviced thousands, repaired them, torn them down, and put them together again. He also stated that if he had gone to an offshore platform, and had seen this particular control, he would have known the stems were made of

the wrong material because the top part had rusted, and these controls are routinely made of stainless steel. He further testified that he had never seen stainless steel rust in the Gulf of Mexico before.

Joe Carroll, then called as a rebuttal witness, testified that in his experience as a machine shop operator in connection with metals, all stainless steel could rust under the condition of "nonpassivating," which he then proceeded to describe.

 The evidence on these points is conflicting, but clearly sufficient to support the trial court's findings. The trial court, as the trier of facts, obviously chose to believe the testimony of Bergeron and Warren over that of Carroll. We, sitting as an appellate court, may not pass upon the credibility of a witness or the weight to be given his testimony, nor may we interfere with the factfinder's resolution of conflicts in the evidence. *Benoit v. Wilson,* 150 Tex. 273, 239 S.W.2d 792 (1951).

We accordingly overrule points of error nine through thirteen.

Appellant urges in points of error seven and eight that the trial court erred in holding that appellee established a complete defense to appellant's claim for damages. He argues that neither the facts or the evidence support such a conclusion. However, we note that the argument for these points is premised upon the conclusion that appellee failed to give notice to appellant of the defect, as required by § 2.607(c)(1) of the Tex.Bus. and Com.Code, which specifically states that the buyer must notify the seller of a breach of warranty or he is barred from any remedy. Since we have concluded that notice was given as required, we reject appellant's position as untenable. ·

Moreover, we note that the trial court's conclusion that appellee established a complete defense to appellant's claim is supported by competent evidence. The trial court found that, based on the evidence presented, appellee established a defense to appellant's claims, that the component parts did not conform to the contract, and

therefore, that appellant was not entitled to receive any further payment on the account. Section 2.717 authorizes a buyer, upon notification to the seller, to deduct all or any part of the damages resulting from any price still due under the same contract. The trial court found appellee was entitled to such a deduction, and there is probative evidence to support the trial court's finding that the component parts were defective. Findings of the trier of fact may not be disregarded if the record discloses any evidence of probative value which, with inferences that may be properly drawn, would reasonably support same. *Johnson v. Buck, supra; Sentry Development Corp. v. Norman, supra.*

As we find ample evidence of probative value that the parts were defective, we must defer to the trial court's finding, and we therefore overrule appellant's seventh and eighth points of error.

The trial court's judgment is in all respects affirmed.