IN THE SUPREME COURT OF TEXAS









IN THE SUPREME COURT OF TEXAS

 

════════════

No. 01-0346 

════════════

 

PPG Industries, Inc.,
Petitioner

 

v.

 

JMB/Houston Centers Partners
Limited Partnership, Respondent

 

════════════════════════════════════════════════════

On Petition for Review from the

Court of Appeals for the Fourteenth District
of Texas

════════════════════════════════════════════════════

 

 

Argued
on November 20, 2002

 

 

Justice O=Neill, joined by Justice Schneider and Justice Smith, concurring in part and dissenting in part.

 

S, a car dealer, turns the odometer back on a
vehicle that it sells to B, clearly a false and deceptive trade practice that
the DTPA was designed to remedy.  Unaware
that the odometer has been tampered with, B sells the car to C a week later and
assigns all warranties associated with it. 
The car immediately breaks down, and C discovers that the vehicle has
100,000 more miles on it than the odometer represents.  After today, C has no remedy against S for
deceptive trade practices because the Court indiscriminately outlaws the
assignment of all DTPA claims, even those that do not raise the policy concerns
the Court fears.  

I agree with the Court that DTPA assignments have
the potential to raise public policy concerns, and when they do we should
address them.  But before proceeding to
abolish, wholesale, the assignment of all DTPA claims B
even those that would further the DTPA=s
purposes B I would
first decide whether HCC had a DTPA claim to assign.  The Court skips over this threshold legal
question to make a broader policy choice. 
Addressing the first question, I conclude that HCC was not a consumer
under the DTPA and was therefore not entitled to invoke its protections.  Having no DTPA claim itself, HCC certainly
could not assign one.  For this reason, I
would reverse and render judgment against JMB on its DTPA claim without
reaching the broader assignability question.  But if I did reach that question, I would
uphold the assignment in this case; it is consistent with the DTPA=s purpose and does not violate public
policy.  The Court=s
decision today is inconsistent with our own jurisprudence and the legislative
intent underlying the DTPA.  Accordingly,
I concur in the Court=s
judgment insofar as it relates to JMB=s
right to recover under the DTPA, although for different reasons.  Further, I agree with the Court that
limitations does not bar JMB=s
claim regarding breach of the twenty-year seal warranty, but I disagree that
the trial court erred in finding that the warranty applied as a matter of
law.  For reasons that the court of
appeals expressed, 41 S.W.3d 270, 284, I would render judgment in JMB=s favor on the breach-of-warranty claim
and respectfully dissent from the Court=s
judgment remanding that claim for a new trial. 


I.  Deceptive Trade Practices Act

A. 
Consumer Status

In 1976, PPG contracted with HCC to provide glass
and glazing for One Houston Center.  As a
buyer of PPG=s goods
and services, HCC qualified as a consumer under the DTPA in effect at the time.  In 1983, the Legislature excluded from the
DTPA=s
consumer protections entities like HCC whose assets exceeded $25 million.  In 1989, JMB, whose assets also exceeded $25
million, purchased the building and was assigned all warranties and claims
associated with it.  In 1994, after many
windows had fogged or discolored, JMB sued PPG for breach of warranty and DTPA
violations.   

Assuming that PPG committed deceptive acts or
practices in connection with selling and servicing its windows, as the jury
found, only a Aconsumer@ has standing to seek recovery against
it under the DTPA.  See Knight v. Int=l
Harvester Credit Corp., 627 S.W.2d 382, 388 (Tex. 1982).  The 1973 version of the Act that applied when
HCC purchased the windows defined Aconsumer@ broadly to include a Acorporation who seeks or acquires by
purchase or lease, any goods or services.@  Act of Apr. 10, 1975, 64th Leg., R.S., ch. 62, '
1, 1975 Tex. Gen. Laws 149, 149 (amended 1983) (current version at Tex. Bus. & Com. Code ' 17.45(4)).  HCC clearly qualified as a Aconsumer@
under this definition.  HCC still owned
the building in 1983 when the Legislature amended the statutory definition to
exclude business consumers with assets exceeding $25 million.  Act of Aug. 29, 1983, 68th Leg., R.S., ch. 883, '
2, 1983 Tex. Gen. Laws 4943, 4943-44 (current version at Tex. Bus. & Com. Code ' 17.45(4)).  HCC did not qualify as a consumer under the
amended definition.  For reasons that
follow, I believe that the amended definition became effective immediately and
operated to extinguish any DTPA claims that HCC might have had.  

The DTPA is a statutory cause of action that the
Legislature created to protect consumers damaged by deceptive trade
practices.  Having created the cause of
action, the Legislature is free to repeal or amend it at any time.  See Knight, 627 S.W.2d at 384.  When a party=s
right or remedy is dependent upon a statute, the repeal of that statute without
a savings clause limiting the repeal=s
effect operates to immediately deprive the party of all rights that have not
become vested or been reduced to final judgment.  Quick v. City of Austin, 7 S.W.3d 109,
128 (Tex. 1999); see also Knight, 627 S.W.2d at 384; Nat=l Carloading
Corp. v. Phoenix-El Paso Express, Inc., 176 S.W.2d 564, 568 (Tex. 1943); Dickson
v. Navarro County Levee Improvement Dist. No. 3, 139 S.W.2d 257, 259 (Tex.
1940).  Thus, Asuits
filed in reliance on the statute must cease when the repeal becomes effective;
if final relief has not been granted before the repeal goes into effect, final
relief cannot be granted thereafter, even if the cause is pending on appeal.@ 
Quick, 7 S.W.3d at 128; see Knight, 627 S.W.2d at
384 (citing Dickson, 139 S.W.2d at 259). 


A savings clause may modify this general rule of
abatement.  Quick, 7 S.W.3d at
128-29.  Texas=s
general savings clause is found in section 311.031 of the Government Code,
which provides that the repeal or amendment of a statute does not affect the
statute=s prior
operation or any rights previously acquired under it.  Tex.
Gov=t Code '
311.031(a).  In this case, the court of
appeals applied the general savings clause and held that the 1983 amendments
did not immediately apply to alter the consumer status of corporations whose
assets exceed the $25 million cap.  41
S.W.3d at 278-79.  In doing so, though,
the court ignored the 1983 Act=s
more specific amendatory language.  While
it may be true that a specific savings clause does not necessarily negate
section 311.031=s general
application, that does not mean the more specific language may be
disregarded.  If contrary legislative
intent can be found in the amendatory language, the general savings clause does
not apply.  Quick, 7 S.W.3d at
130.  Accordingly, I begin by analyzing
the 1983 Act=s
amendatory terms.   

The 1983 amendments to the DTPA effected three
separate changes.  First, as already
said, the amendments excluded from the Act=s
consumer protections businesses with assets exceeding $25 million.  Second, the legislation allowed smaller
businesses with assets of $5 million or more to waive the Act=s protections by written contract.  Finally, the Act added a definition of Abusiness consumer.@ 
Act of Aug. 29, 1983, 68th Leg., R.S., ch.
883, ''
1, 2, 1983 Tex. Gen. Laws 4943, 4943-44 (current version at Tex. Bus. & Com. Code '' 17.42, 17.45(4)).  Section 4 then contains the following
provision:  

 

This
Act applies only to a contract executed on or after the effective date
of this Act.  A contract executed before
the effective date of this Act is governed by the law in effect when the
contract was executed.

 

Act of Aug. 29, 1983, 68th Leg., R.S., ch.
883, ' 4, 1983
Tex. Gen. Laws 4943, 4944 (emphasis added). 
The question, then, is whether this savings provision applies only to
the portion of the amending act governing contractual waivers, or if it also
preserves the consumer status of corporations with assets exceeding $25 million
as to transactions occurring before the amendment=s
effective date.  I conclude that the
specific amendatory language indicates the Legislature did not intend to leave
the consumer status of corporations exceeding the asset cap intact as to
pre-amendment transactions.

Section 4 of the 1983 Act specifically provides
that the Act applies only to Acontract[s]
executed@ on or
after the amendments=
effective date, indicating that it must have intended to preserve from the
amendments=
immediate effects contracts that were executed before.  Id. 
The DTPA=s
protections, though, extend beyond transactions based upon written
contracts.  From its inception, the DTPA
has defined a Aconsumer@ as anyone Awho
seeks or acquires@ goods or
services.  Act of May 21, 1973, 63rd Leg.,
R.S., ch. 143, '
1, 1973 Tex. Gen. Laws 322, 323 (current version at Tex. Bus. & Com. Code '
17.45(4)).  Thus, Aconsumers@ do not need a written contract; the
Act encompasses those with oral contracts or no contract at all (i.e.,
mere shoppers).  If the Legislature truly
meant the asset cap to apply only to Acontracts
executed@ after
1989, then it has never become operative for oral contracts or shoppers.  Such a reading would contravene the
Legislature=s
directive that, in construing statutes, we should presume that Athe entire statute is intended to be
effective.@  Tex.
Gov=t Code '
311.021(2).  

Moreover, the Legislature knows how to more
broadly preserve claims if that is its intent. 
The Legislature clearly expressed its intent to Asave@ all claims arising in whole or in part
before its 1979 and 1981 DTPA amendments became effective.  As to the 1979 amendments, the Legislature
stated that A[t]his
Act shall be applied prospectively only. 
Nothing in this Act affects either procedurally or substantively a cause
of action that arose either in whole or in part prior to the effective date of
this Act.@  Act of Apr. 10, 1979, 66th Leg., R.S., ch. 603, '
9, 1979 Tex. Gen. Laws 1327, 1332.  The
1981 amendatory language is similarly broad: 
ANothing
in this Act shall affect procedurally or substantively a cause of action
arising in whole or in part prior to the effective date of this Act.@ 
Act of March 30, 1981, 67th Leg., R.S., ch.
307, ' 2, 1981
Tex. Gen. Laws 863, 864.  By contrast,
the Legislature=s 1983 effective-date
provision is carefully limited to executed contracts, which can only refer to
the contractual waiver provision.  As
some commentators have noted:  

 

There
is no savings clause in the 1983 amendments to the DTPA which would save a
business consumer=s pending
cause of action.  The savings clause of
the 1983 amendments is applicable only to contracts executed before the
effective date of the amendment (i.e., waivers of DTPA claims in contracts
executed before effective date are not valid.)

 

The Texas legislature clearly distinguishes its
express intent regarding the immediate application of the 1979 and 1981
amendments to a pending cause of action from the 1983 amendments.  In 1983, the legislature expressly chose to Asave@
only existing contracts (i.e., no valid disclaimer of DTPA rights in contracts
executed before effective date) from immediate or retroactive application, and
did not intend to Asave@ the cause of action of a business
consumer (with more than $25 million in assets) arising in whole or in part
prior to the effective date of such amendment.

 

Andy A. Tschoepe II, et al., Aspects
of Defending a Texas Deceptive Trade Practices B
Consumer Protection Act Claim, 20
St. Mary=s L.J. 527, 555-56 (1989).  

Because the specific 1983 amendatory language
indicates the Legislature did not intend to preserve a business consumer=s claim that arose before the effective
date, the general savings clause found in section 311.031(a) has no
application.  Thus, the 1983 amendment
establishing the $25 million asset cap became effective immediately and
extinguished HCC=s
consumer status.  As a nonconsumer, then, HCC had no cause of action under the DTPA
when it sold the building to JMB in 1989; the only claims JMB acquired in that
purchase were potential breach-of-warranty claims.  For this reason, I agree that JMB may not
recover under the DTPA.  But if HCC did
qualify as a consumer, I would uphold the assignment of its DTPA claim to JMB
when it sold the building. 

B.  Assignability

The Court concludes that DTPA assignments in
general, and the one in this case particularly, violate public policy and
thwart the Legislature=s
purpose.  While this may be true in some
other case, I fail to see it here.  JMB
owns the defective and allegedly misrepresented ATwindows@
and has suffered real economic harm.  JMB=s DTPA breach-of-warranty claim is, in
essence, a property-damage claim, and such claims have long been freely
assignable.  See, e.g., G.H. &
S.A.R.R. v. Freeman, 57 Tex. 156, 157 (Tex. 1882); Allstate Ins. Co. v.
Kelly, 680 S.W.2d 595, 610 (Tex. App.BTyler
1984, writ ref=d n.r.e.); Rosell v.
Farmers Tex. County Mut. Ins. Co., 642
S.W.2d  278, 279 (Tex. App.BTexarkana 1982, no writ); see also Thomes v. Porter, 761 S.W.2d 592, 594 (Tex. App.BFort Worth 1988, no writ) (holding DTPA
claim survived owner=s
death and could be pursued by estate). 
Moreover, common-law principles support the assignment in this
case.  See Thomes,
761 S.W.2d at 594 (applying common-law rules because the DTPA does not
expressly provide for survival of a cause of action).  

In State Farm Fire & Casualty Co. v. Gandy,
we examined the history of assignments and the policy considerations underlying
them.  925 S.W.2d 696, 705-11 (Tex.
1996).  At early common law, a chose in
action generally could not be assigned.  Id.
at 705.  This aversion to assignments was
based in part upon courts=
reluctance to increase or distort litigation. 
See id. at 706. 
Assignments were also disfavored because, under the common law, a chose
in action presupposed a personal relationship between the parties which could
not be transferred.  See id.;
see also James B. Ames, The
Inalienability of Choses in Action, in Lectures in Legal History 210, 211-212
(1913).  

Over time, the demands of commerce eroded the
disfavored status of assignments, although certain uniquely personal tort
actions which affected their owner=s
person, personal feelings, or character B
such as slander, libel, battery, and false imprisonment B
remained unassignable under the common law.  See Gandy, 925 S.W.2d at 706-07;
Walter W. Cook, The Alienability of Choses in
Action, 29 Harv. L. Rev. 816,
826-29 (1916).  The continued nonassignability of such claims was justified by the
concern that the factors determining liability and damages were so closely
associated with the particular actors involved in the alleged wrongdoing that
they could not be fairly assessed when one of the actors was replaced.  See Gandy, 925 S.W.2d at 706-07; Freeman,
57 Tex. at 157; see also Mallios v. Baker, 11
S.W.3d 157, 169 (Tex. 2000) (Hecht, J.,
concurring).  But Awhen
the injury affect[ed] the estate rather than the person . . . the right of
action could be bought and sold.@  Freeman, 57 Tex. at 157.  Thus, assignability
of property-damage claims long ago became the general rule.  See, e.g., Graham v. Franco,
288 S.W.2d 390, 393 (Tex. 1972); Stewart v. H. & T.C. R=y Co., 62 Tex. 246, 247 (1884); Wolff
v. Commercial Standard Ins. Co., 345 S.W.2d 565, 568 (Tex. Civ. App.BHouston
1961, writ ref=d n.r.e.); Wichita City Lines, Inc. v. Pucket,
288 S.W.2d 122, 124 (Tex. Civ. App.BFort Worth 1956), aff=d, 295 S.W.2d 894 (1956); see
also Johnson v. Rolls, 79 S.W. 513, 514 (Tex. 1904) (noting that at Acommon law all causes of action for
damages die with the person of the party injured, or the person inflicting the
injury, except such damages as grow out of acts affecting the property rights
of the injured party@).  

Gradually, assignability
of choses in action expanded beyond contract and
property-damage claims to include torts and other wrongful acts.  See Gandy, 925 S.W.2d at 707.  On the premise that assignability
depended on survivability, the passage of the Texas Survivor Statute meant that
personal injury claims became assignable. 
See Act of May 4, 1895, 24th Leg., R.S., ch. 89, '
1, 1895 Tex. Gen. Laws 143 (amended 1985) (current version at Tex. Civ. Prac. & Rem. Code ' 71.021); Gandy, 925 S.W.2d at
707 (AOn the
theory that assignability of a chose in action
depended on whether it survived the owner=s
death, personal injury claims thus became assignable in Texas.@); Beech Aircraft Corp. v. Jinkins III, 739 S.W.2d 19, 22 (Tex. 1987) (AWe are mindful of the general rule that
a cause of action for damages for personal injuries may be sold or assigned.@) (citations omitted).  Thus, while some of the common law=s reservations still remain, choses in action are now generally considered freely
alienable.  See Gandy, 925 S.W.2d
at 707; Doty v. Caldwell, 38 S.W. 1025 (Tex. App. 1897, no writ); see
also Int=l
Proteins Corp. v. Ralston-Purina Co., 744 S.W.2d 932, 934 (Tex. 1988) (AAs a general rule a cause of action may
be assigned . . . .@). 

In Gandy, which involved an attempted
assignment of an insured=s
DTPA and other claims against his insurer, we decided the claims= assignability
based on considerations of equity and public policy.  925 S.W.2d at 696; see also Int'l
Proteins, 744 S.W.2d at 934 (invalidating assignment of plaintiff's
products liability and negligence claims to joint tortfeasor
as contrary to public policy).  The facts
presented in Gandy are instructive. 
There, the plaintiff sued her stepfather, Pearce, for sexual abuse.  Gandy, 925 S.W.2d at 698.  State Farm, which insured the Pearce home,
agreed to pay for Pearce=s
defense and reserved its right to contest coverage.  Id. at 699-700.  Pearce and Gandy settled the case, and, as
part of the settlement, Pearce assigned any claims against State Farm to
Gandy.  Id. at 700.  Although Pearce had originally denied ever
abusing Gandy, after the settlement was negotiated he agreed to a $6 million
adverse judgment reciting that he had abused her on 325 occasions.  Id. at 712.  And contrary to the position that Gandy took
in her suit against Pearce, she argued in her suit against State Farm as Pearce=s assignee that Pearce would not have
been liable had State Farm properly handled his defense, while Pearce returned
to his original contention that he had never abused Gandy and would have proved
his innocence had State Farm provided him with competent counsel.  Id.

In holding that the assignment in Gandy was
invalid, our concerns were twofold. 
First, rather than resolving the suit, the assignment prolonged the
litigation.  Even after the district
court held as a matter of law that Gandy=s
claims were not covered and that State Farm had no duty to defend Pearce, the
settlement practically guaranteed that litigation would continue because, Aas Gandy=s
counsel freely testified, the entire purpose of the arrangement was to find a
way to recover against State Farm.@  Id. 
Second, and more importantly, the assignment distorted the litigation,
causing the parties to take Apositions
that appeared contrary to their natural interests for no other reason than to
obtain a judgment against State Farm.@  Id. 
Thus, we held the claims nonassignable based
on public policy concerns.  Id. at
713.  

We have also held that Mary Carter agreements,
which assign a plaintiff=s
claims against a nonsettling defendant to a settling
defendant, are void as against public policy. 
Elbaor v. Smith, 845 S.W.2d 240
(Tex. 1992).  These arrangements Anearly always ensure a trial against
the non-settling defendant@
and Agrant the
settling defendant veto power over any proposed settlement between the
plaintiff and any remaining defendant.@  Id. at 248.  They also confuse the jury by presenting Aa sham of adversity@ between the plaintiff and settling
defendant.  Id. at 249.  We concluded that public policy did not
support arrangements Athat
skew the trial process, mislead the jury, promote unethical collusion among
nominal adversaries, and create the likelihood that a less culpable defendant
will be hit with the full judgment.@  Id. at 250.  Similar concerns that arise when parties
purport to assign legal malpractice actions. 
See Zuniga, Jr. v. Groce, Locke & Hebdon, 878 S.W.2d 313, 318 (Tex. App.BSan Antonio 1994, writ ref=d) (noting that such assignments would
cause Aa
demeaning reversal of roles@
and a Ashameless
shift of positions@).  

The assignment of HCC=s
warranty-based DTPA claims to JMB when it purchased the building does not
present the same concerns.  The
assignment did not spawn litigation that would not likely have occurred
otherwise.  Instead, the DTPA claims are
in the hands of the defective windows=
owner, who seeks the same remedy the assignor could have pursued had it not
sold the building.  Furthermore, the
assignment does not require the assignor and assignee to assume positions
contrary to their natural interests, nor is the assignment likely to cause jury
confusion.  Consequently, the distortion
of the litigation process that we deplored in Gandy and Elbaor is simply nonexistent.  

The Court additionally premises its holding on the
notion that, because the DTPA permits the recovery of enhanced damages, DTPA
claims are punitive in nature and thus should not be assignable.  Without question enhanced damages, by
definition, produce an award that exceeds the amount of underlying damage and
therefore have a punitive effect.  But
the DTPA=s
enhanced-damages provision also has a remedial purpose that the Court entirely
ignores.  The remedial aspect is
expressed in the statutory language, which states that the Act=s underlying purpose is Ato protect consumers against false,
misleading, and deceptive business practices, unconscionable actions, and
breaches of warranty and to provide efficient and economical procedures to
secure such protection.@  Act of May 21, 1973, 63rd Leg., R.S., ch. 143, '
1, 1973 Tex. Gen. Laws 322, 322-23 (amended 1995) (current version at Tex. Bus. & Comm. Code ' 17.44(a)); see generally John L. Hill, Introduction to
Consumer Law Symposium, 8 St.
Mary=s L. J. 609, 609-12 (1977) (discussing
the lack of consumer protections and the inadequacy of remedies for consumer
complaints prior to the DTPA).  The
Legislature has expressed its intent that the DTPA be Aliberally
construed and applied to promote its underlying purposes . . . .@ 
Act of May 21, 1973, 63rd Leg., R.S., ch. 143,
' 1, 1973 Tex. Gen. Laws 322 (amended
1995) (current version at Tex. Bus.
& Comm. Code '
17.44(a)). We have observed that Aone
purpose of the DTPA=s treble
damages provision is to encourage privately initiated consumer litigation,
reducing the need for public enforcement.@  Pennington v. Singleton, III, 606
S.W.2d 682, 690 (Tex. 1980).  The DTPA=s enhanced-damages provision also acts
as a deterrent in discouraging violations by others.  That the damages in this case were mandatorily trebled indicates an intent that they be
proportional to the magnitude of the harm caused and not dependent on the
degree of the defendant's culpability, making them less personal than ordinary
punitive damages and underscoring the trebling provision's remedial
purpose.  See Act of May 21, 1973,
63rd Leg., R.S., ch. 143, '
1, 1973 Tex. Gen. Laws 322, 327; Woods v. Littleton, 554 S.W.2d 662, 671
(Tex. 1977); Pennington, 606 S.W.2d at 691 (noting that culpability is
an important consideration of section 17.50 as amended in 1979).  Our decision in Pace v. State, 650
S.W.2d 64 (Tex. 1983), does not negate the DTPA=s
remedial effect.  There, plaintiffs
sought to recover from the Real Estate Recovery Fund, a public fund the
Legislature created to reimburse those who suffered monetary loss caused by
unscrupulous real estate agents.  Id. at
65.  Relying on the statutory
mandate that the fund be used Afor
reimbursing aggrieved persons who suffer monetary damages,@ we noted that treble damages are
punitive rather than restitutionary and A[t]herefore
the Legislature could not have intended that treble damages be paid from the
fund.@  Id. at 65 (emphasis in original).  Designed to remedy a public harm with limited
funds, the Real Estate Recovery Fund specifically provided a limited
remedy.  That does not mean, however,
that mandatory DTPA trebling is devoid of remedial purpose.  The punitive aspect that the Court emphasizes
is only one of several purposes that the DTPA serves.[1]

The closely analogous Sherman Anti-Trust Act
provides a useful comparison.  Similar to
the version of the DTPA in question here, a violation of the antitrust act
gives rise to a claim for mandatory treble damages.  15 U.S.C. '
15(a).  As under the DTPA, these damages
have a punitive effect, but they were also Adesigned
to deter future antitrust violations@
and were Acreated
primarily as a remedy.@  Am. Soc=y
of Mech. Eng=rs, Inc. v. Hydrolevel Corp.,
456 U.S. 556, 575 (1982); see, e.g., Brunswick Corp. v. Pueblo
Bowl-O-Mat, Inc., 429 U.S. 477, 485 (1977) (noting treble damages function
to penalize and deter wrongdoers).  And
federal law is uniform in holding that an action to recover treble damages
under the Sherman Anti-Trust Act Ais
not an action to recover a penalty@
and is assignable.  See Hicks v. Bekins Moving & Storage Co., 87 F.2d 583, 585 (9th
Cir. 1937) (citing Chattanooga Foundry & Pipe Works v. Atlanta, 203
U.S. 390, 397 (1906)); see also, e.g., Sampliner
v. Motion Picture Patents Co., 254 U.S. 233, 234 (1920); Gulfstream III Assocs., Inc. v. Gulfstream Aerospace Corp., 995 F.2d 425, 431 (3rd Cir.
1993); Chiropractic Coop. Ass=n
of Mich. v. Am. Med. Ass=n,
867 F.2d 270, 272 (6th Cir. 1989); Health Care Equalization Comm. of the
Iowa Chiropractic Soc=y
v. Iowa Med. Soc=y,
851 F.2d 1020, 1022 (8th Cir. 1988); Klamath-Lake Pharm.
Ass=n v.
Klamath Med. Servs. Bureau, 701 F.2d 1276, 1283
(9th Cir. 1983); Fazakerly v. E. Kahn=s Sons Co., 75 F.2d 110, 114 (5th
Cir 1935).  That anti-trust violations
result in injury to the property or business, not the person, of the
individuals bringing claims further operates in favor of assignability.  See Moore v. Backus, 78 F.2d
571, 576 (7th Cir. 1935); United Copper Sec. Co. v. Amalgamated Copper Co.,
232 F. 574, 577-78 (2d Cir. 1916).[2]  

Finally, the Court vastly overstates our holding
in Amstadt v. United States Brass Corp.,
919 S.W.2d 644, 647 (Tex. 1996).  There,
we addressed Awhether
the Legislature intended that upstream suppliers of raw materials and component
parts be liable under the DTPA when none of their misrepresentations reached
the consumers.@  Id. at 652 (emphasis added).  Our concern was that the deceptive act or
practice touch the consumer transaction: A[the
defendants=] actions
were not connected with the plaintiffs=
transactions, that is, the sale of the homes, in a way that justifies
liability under the DTPA.@  Id. (emphasis added).  There is nothing in our Amstadt
opinion to suggest that, had the defendants=
misrepresentations been directly connected with the homes= sale, subsequent buyers of the homes
could not assert DTPA claims by assignment. 
This is entirely consistent with our decision in Gupta v. Ritter
Homes, Inc., 646 S.W.2d 168, 169 (Tex. 1983), which involved a homeowner=s warranty-based DTPA claim against the
builder, where we said: 

 

As
between the builder and owner, it matters not whether there has been an
intervening owner.  The effect of the
latent defect on the subsequent owner is just as great as on the original buyer
and the builder is no more able to justify his improper work as to a subsequent
owner than to the original buyer.

 

Id.  Amstadt simply did not concern warranty-based DTPA
claims against a product supplier whose representations were made directly to
the consumer B in this
case HCC. 

In sum, none of the theories that have been
applied to determine a claim=s
assignability supports striking down the assignment
in this case.  Liability is predicated
upon a breach-of-warranty property-damage claim, which has long been held
assignable at common law.  Recognizing the
validity of such an assignment is consistent with the DTPA=s underlying purposes and does not give
rise to the policy concerns that led us to invalidate the assignment in Gandy.  Just as C should be able to assert a DTPA
claim against S for turning back his vehicle=s
odometer before sale, JMB should be able to step into HCC=s shoes and, were HCC a consumer,
assert a DTPA claim against PPG.  

II. 
Breach of Warranty

JMB additionally asserts claims based upon PPG=s alleged breach of five- and
twenty-year warranties.  I agree with the
Court that limitations does not bar JMB=s
claims that are based on the twenty-year seal warranty.  PPG contends, though, that JMB cannot recover
under that warranty because it failed to obtain jury findings that the warranty
formed the Abasis of
the bargain@ and that
JMB notified PPG of the defect within a reasonable time.  See Tex.
Bus. & Com. Code ''
2.313(a)(1), 2.607(c)(1).  The Court
agrees, holding that the trial court erred in finding these elements as a
matter of law rather than submitting them to the jury.  I disagree. 


An issue that is conclusively established as a
matter of law should not be submitted to the jury.  See T.O. Stanley Boot Co., Inc. v. Bank of
El Paso, 847 S.W.2d 218, 222-23 (Tex. 1992); Tex. R. Civ. P. 278 (requiring the court to submit to the
jury only those questions raised by the pleadings and the evidence).  Thus, if the trial court correctly found that
these elements were conclusively established, it did not err in failing to
submit them.  See Green Int=l,
Inc. v. Solis, 951 S.W.2d 384, 391-92 (Tex. 1997) (holding that trial court
properly refused to submit a question unsupported by evidence to jury).  

To be actionable, a representation relating to an
express warranty must form a Abasis
of the bargain.@  See Tex.
Bus. & Com. Code '
2.313 cmt. 3; Sweco,
Inc. v. Cont=l Sulfur
& Chem., 808 S.W.2d 112, 115 (Tex. App.BEl
Paso 1991, writ denied).  PPG argues that
the warranty could not have formed a basis of the bargain because there was no
evidence PPG relied on it.  JMB, on the
other hand, relying on a comment to section 2.313, claims no particular
reliance need be shown for a representation to become an actionable part of the
agreement.  Whether or not reliance is an
essential element of a breach-of-warranty claim is a question we recently noted
in Compaq v. Lapray is undecided in
Texas.  ____ S.W.3d ____, ___ (Tex. 2004).   But we do not need to answer that question
here because, whether or not specific reliance is a necessary element, it was
shown here.     It is undisputed that PPG published the twenty-year warranty in
Sweet=s Architectural
Guide before HCC accepted its bid for the ATwindows@
in order to induce customers to purchase its product.  Jim Gatton, HCC=s lead architect, testified that he
depended upon the information that PPG provided in Sweet=s
Guide:  

 

It
was very important to us.  It presented
the Pittsburgh Plate Glass [PPG], as well as other glass products within the Sweet=s Architectural file.  We read it very closely.  We were dependent upon the information that
was printed about the glass in the Sweet=s
index.  

 

Gatton specifically testified that he
relied on the warranty, along with the product specifications provided in Sweet=s, in selecting the ATwindows@ for One Houston Center.  The only evidence that PPG offered to
controvert HCC=s
contention that it selected the ATwindows@
based on the twenty-year warranty was Gatton=s testimony that the warranty was not
the only reason ATwindows@
were chosen.  But it is not necessary to
a breach of warranty action to prove that the warranty was the only basis upon
which a particular product was chosen. 
To become a Abasis of
the bargain,@ it need
only be shown that the affirmation of fact or promise made to the buyer was part
of the basis of the bargain, not the sole basis.  See Tex.
Bus. & Com. Code '
2.313(a)(1). 

The Court concludes that the trial court erred in
determining as a matter of law that the twenty-year warranty was a basis of the
bargain, in part, because Gatton Adid not explain why he omitted it when
he drew up the bid specification that included numerous other shorter
warranties.@ ___
S.W.3d at ___.  But Gatton
testified repeatedly that the warranty was considered the equivalent of other
specifications of the ATwindows,@
such as U-value and shading coefficient, that also were not expressly stated in
the contract.  He explained that the
twenty-year warranty was Apart
of the statement by PPG that they would provide along with the glass, along
with the shading coefficient, stated with the U-value with everything else they
said about the glass.@  Gatton had
previously testified that HCC chose ATwindows@
based upon their shading coefficient, their U-value, and the warranty because
these specifications best fit the building=s
needs. 

PPG also argues that it had revised the warranty
to a ten-year limited warranty before it signed the contract to supply HCC
windows, and offered in support a July 1, 1976, a letter from PPG=s senior vice president informing the
trade that PPG was offering a ten-year warranty, effective September 1,
1976.  But PPG presented no evidence that
this letter was ever disseminated or published. 
Moreover, HCC accepted PPG=s
bid on May 27, 1976, over three months before the purported revised warranty=s effective date.  The testimony of PPG=s
lay witnesses that the ten-year warranty was the operative one are conclusory legal opinions not binding on the court.  See Anderson v. Snider, 808 S.W.2d 54,
55 (Tex. 1991).  PPG presented no
evidence of rescission or modification of the twenty-year warranty.  Thus, the trial court did not err in failing
to submit the Abasis of
the bargain@ issue to
the jury. 

PPG also contends that the trial court erred in
failing to submit the issue of reasonable notice of breach of warranty to the
jury.  Again, I disagree.  The question of reasonable notice may be
decided as a matter of law.  See O=Ferral v.
Coolidge, 228 S.W.2d 146, 148 (Tex. 1950). 
Here, the uncontroverted evidence shows that
HCC first notified PPG of a Ahalo
effect@ in some
units in 1982.  PPG inspected the units
and saw the problems first-hand.  See
Carroll Instrument Co. v. B.W.B. Controls, Inc., 677 S.W.2d 654, 657-58
(Tex. App.B Houston
[1st Dist.] 1984, no writ) (buyer gave adequate notice by showing defective
part to seller).  PPG received
notification of problems with additional units in July 1989.  PPG=s
notice to JMB in October 1989 that it would no longer replace failed units also
suggests that it had notice of the continuing problems.  

In sum, the trial court did not abuse its
discretion in refusing to submit the Abasis
of the bargain@ or
reasonable notice issues to the jury. 
Because legally sufficient evidence supports the jury=s finding that JMB neither discovered
nor should have discovered PPG=s
breach of the twenty-year warranty, I would affirm the court of appeals
judgment in JMB=s favor
on this claim.  

As to the five-year warranty, PPG contends that
JMB=s claims are barred by
limitations.  But JMB alleged the same
injuries under the twenty-year warranty, and the jury awarded the same amount
of damages for each breach that it found. 
Because the judgment can be sustained on the jury=s
findings regarding JMB=s
twenty-year warranty claim, I would not reach PPG=s
arguments challenging recovery under the five-year warranty.

III. Conclusion

I would hold that JMB may not invoke the DTPA=s consumer protections, and therefore
concur in the Court=s
judgment to the extent it renders judgment against JMB on that claim.  I also agree with the Court that limitations
does not bar JMB=s claims
based on breach of the twenty-year seal warranty.  I disagree, though, with the Court=s sweeping conclusion that no DTPA
claims are assignable and its conclusion that the trial court abused its
discretion in the manner in which it submitted the breach-of-warranty claim to
the jury.  I would affirm the court of
appeals= judgment
on the breach-of-warranty claim.  Because
the Court remands that claim for a new trial, I respectfully dissent.   

 

 

__________________________________________

Harriet O=Neill


Justice

 

 

OPINION
DELIVERED: July 9, 2004  

 

 

 

 

 











[1] Many other courts, in assessing the assignability of enhanced damages under state law, have
abandoned the remedial/punitive distinction, focusing instead on the underlying
claim=s assignability.  See, e.g., Cuson
v. Md. Cas. Co., 735 F. Supp. 966, 971 (D. Haw.
1990) (applying Hawaii law and holding that Apunitive
damages claims which have their genesis in [assignable claims] are assignable
as well@); Fed. Deposit Ins. Corp. v. W.R. Grace & Co.,
691 F. Supp. 87, 92 (N.D. Ill. 1988) (applying Illinois law and holding that
punitive damages are assignable if the underlying claim is assignable because Apunitive damages are a type of relief which is part
and parcel of the underlying cause of action@), rev=d in part on other grounds, 877 F.2d 614 (7th Cir. 1989); First Fed. Sav. & Loan Assoc. of Pittsburgh v. Oppenheim,
Appel, Dixon & Co., 629 F. Supp. 427, 446-47
(S.D.N.Y. 1986) (applying federal and state law and concluding that Aonce a cause of action is determined to be assignable,
a punitive damage claim based upon the cause of action may also be brought by
the assignee@); Oppel v. Empire
Mut. Ins. Co., 517 F. Supp. 1305, 1307 (S.D.N.Y.
1981) (concluding that because ANew York courts permit punitive damages in a bad faith
case . . . there is no reason why this cause of action also cannot be assigned@); Kleinwort Benson N. Am., Inc. v. Quantum Fin. Servs., Inc., 692 N.E.2d 269, 273-75 (Ill. 1998)
(holding that punitive damages are a component of relief and are therefore Adeemed a part of the underlying action,@ and assignability favors
the public policy goal of deterrence); Clearwater v. State Farm Mut. Auto. Ins., 780 P.2d 423, 427 (Ariz. Ct. App.
1989), vacated in part on other grounds, 792 P.2d 719 (Ariz. 1990)
(holding that under Arizona law a claim for bad faith was not a personal tort
and neither law nor public policy prevented the punitive damages aspect of the
claim from being assigned); see also INS Investigations Bureau, Inc. v. Lee,
709 N.E.2d 736, 742 (Ind. Ct. App. 1999) (applying Indiana law); Allstate
Ins. Co. v. Axsom, 696 N.E.2d 482, 285-86 (Ind.
Ct. App. 1998) (applying Indiana law and holding bad faith insurance claims
assignable); Kaplan v. Harco, Nat. Ins. Co., 716
So. 2d 673, 680 (applying Mississippi law and concluding that public policy
goal of deterrence is fostered by allowing assignment of punitive
damages).  Under this line of authority,
the assignability of DTPA treble damages would depend
upon the assignability of JMB's
underlying warranty claim, which has long been recognized as assignable.  This result is consistent with our opinion in
Hofer v. Lavendar, 679 S.W.2d 470, 472-75 (Tex.
1984), in which we held that punitive damages survive along with an underlying
claim for personal injury.

 





[2] Enhanced-damage awards under other federal statutory
schemes have similarly been held to be nonpenal in
nature and therefore assignable.  These
claims include treble-damage patent actions, see, e.g., Cheramie v. Orgeron,
434 F.2d 721, 723 (5th Cir. 1970); Pierce v. Allen B. Du
Mont Labs., Inc., 297 F.2d 323, 324-25 (3rd Cir. 1961); Armstrong v.
Emerson Radio & Phonograph Corp., 132 F. Supp. 176, 179 (S.D. N.Y.
1955); Activated Sludge, Inc. v. Sanitary Dist. of Chicago, 64 F. Supp.
25, 35-36 (N.D. Ill. 1946), fifty-percent penalties for civil tax fraud, see,
e.g., Reimer=s Estate v. Comm=r of Internal Revenue, 180 F.2d 159, 160 (6th Cir. 1950); Kahr v. Comm=r of Internal Revenue, 414 F.2d 621, 626 (2d Cir. 1969); Rau=s Estate v. Comm=r of Internal Revenue, 301 F.2d 51, 55-56 (9th Cir. 1962); Kirk v. Comm=r of Internal Revenue, 179 F.2d 619, 621-22 (1st Cir. 1950), and
treble-damage Truth-in-Lending Act claims, see e.g., Porter v.
Household Fin. Corp., 385 F. Supp. 336, 342 (S.D. Ohio 1974); Murphy v.
Household Fin. Corp., 560 F.2d 206, 211 (6th Cir. 1977); but see Johnson
v. Household Fin. Corp., 453 F. Supp. 1327, 1331 (S.D. Ill. 1978) (holding
that because Aactual damages are not a necessary allegation@ of a complaint under the Truth-in-Lending Act, the
statutory award is a civil penalty and does not survive).  See also W. Auto Supply Co. v.
Gamble-Skogmo, Inc., 348 F.2d 736, 740-41 (8th
Cir. 1965), Derdiarian v. Futterman Corp., 223 F. Supp. 265, 270-71 (S.D.N.Y.
1963); Int=l
Ladies= Garment Workers=
Union v. Shields & Co., 209 F.
Supp. 145, 149-50 (S.D.N.Y. 1962); Mills v. Sarjem
Corp., 133 F. Supp. 753, 761-62 (D. N.J. 1955) (all holding that securities
fraud claims, which limit recovery to actual damages, are assignable since they
are neither penal nor personal).